IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANE DECECCO,** | ) | CIVIL ACTION NO.  12-272 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UPMC** *and* **UPMC PRESBYTERIAN** | ) | |
| **SHADYSIDE,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

CONTI, Chief District Judge

### I.  Introduction

Pending before the court is a motion for partial summary judgment (ECF No. 94) filed by plaintiff Diane DeCecco ("plaintiff" or "DeCecco") and a motion for summary judgment (ECF No. 97) filed by DeCecco's former employer, defendants UPMC and UPMC Presbyterian Shadyside (collectively "defendants" or "UPMC").

Plaintiff initiated this action on March 2, 2012 by filing a complaint alleging UPMC discriminated against her in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"). (ECF No. 1.) In the complaint, plaintiff requests

> individual legal and equitable remedies under 29 U.S.C. §§ 626(b) and (c)(1) for
> Defendants' age-based termination of her employment in violation of 29 U.S.C. §
> 623(a), and for Defendants' retaliation against Plaintiff in violation of 29 U.S.C. §
> 626(d) for having filed an EEOC Charge, obtained a Cause Finding and/or for
> communicating to UPMC in writing her opposition to age discrimination at
> UPMC[; and]

individual and systemwide declaratory and injunctive remedies under 29 U.S.C. §§ 626(b) and (c)(1) for UPMC's systemic violations of 29 U.S.C. § 626(f) and § 623(d), and systemic violations of public policy, as manifest on the face [sic] UPMC's standardized Release Agreements, and set forth in ¶ 4 of this Complaint.

(Id. ¶¶ 12, 13.) On April 12, 2012, defendants filed their answer asserting, among other defenses, that

Plaintiff's claim which is founded upon the Age Discrimination in Employment Act ("ADEA") is barred by reason of plaintiff's having entered into an Agreement whereby, for good and valuable consideration, she waived all claims against the defendants, including claims under the ADEA.

(ECF No. 10 at 4.)

On April 24, 2012, plaintiff filed a motion for partial judgment on the pleadings and a brief in support of the motion arguing "[n]umerous ADEA and public policy violations appear on the face of UPMC's standardized Release Agreement" and it, therefore, violates public policy and § 623(d) and § 626(f)(1), (f)(3) and (f)(4) of the ADEA. (ECF No. 12 ¶ 2.) Plaintiff in her motion for judgment on the pleadings requested the court

a. Declar[e] the challenged provisions of the UPMC Release Agreement unlawful under the ADEA and contrary to public policy,

b. Afford[] prospective injunctive relief by enjoining Defendants from further use of the Release Agreement, ordering Defendants to draft and henceforth use a legally compliant Release Agreement, ordering Defendants to expunge the unlawful Release Agreement from their computer systems, and ordering Defendants to create policies, procedures and safeguards to ensure continuing compliance with the law, and,

c. Order[] that restorative injunctive relief will be afforded for older workers who received an unlawful Release Agreement from UPMC in the past, subject to further proceedings and further order of court.

(Id. ¶¶ a-c.) On May 29, 2012, defendants filed a response in opposition to plaintiff's motion for judgment on the pleadings. (ECF No. 19.) On June 11, 2012, after receiving leave of court, plaintiff filed a reply to defendants' brief in opposition. (ECF No. 21.) At a hearing held on

August 9, 2012, the court granted in part and denied in part plaintiff's motion for judgment on the pleadings. The court on the record at the hearing stated:

> With respect to the part of the judgment on the pleadings that's seeking a declaration, in essence, that the release is invalid under the applicable -- under the standards set forth in Rupert and Bogatz, that it violates the Older Workers Benefit Protection Act and the ADEA, the Court will find that it does so violate the -- it is an invalid waiver, and we'll so order, thereby granting in part the motion for judgment on the pleadings.
>
> The Court denies that aspect of the motion for judgment on the pleading seeking the specific prophylactic relief with respect to enjoining the Defendant from continuing to utilize these types of waivers and any other form of injunctive relief. And that will be for another day. Okay? Now -- so it's granted in part and denied in part. Thank you.

(H.T. 8/9/12 (ECF No. 40) at 31.) The court determined it would consider plaintiff's claims for systemwide relief separate from her claims for individual relief. Fact discovery proceeded with respect to the claims for individual relief, but not with respect to claims for systemwide relief.

On January 26, 2013, defendants filed a motion to dismiss with respect to plaintiff's claims for systemwide equitable intervention and a brief in support of the motion. (ECF Nos. 63, 64.) On February 28, 2013, plaintiff filed a response in opposition to defendants' motion. (ECF No. 73.) On May 20, 2013, the court held a hearing on defendants' motion to dismiss. The court analyzed the motion to dismiss as a motion for judgment on the pleadings because defendants filed an answer to the complaint prior to filing the motion to dismiss. The court denied the motion to dismiss on the record holding plaintiff may be entitled to systemwide relief under the ADEA.

On July 1, 2013, plaintiff filed a partial motion for summary judgment with respect to her claim for facial retaliation under the ADEA, a brief in response to that motion, and a concise statement of material facts. (ECF Nos. 94, 95, 96.) On August 22, 2013, defendants filed a motion for summary judgment with respect to both claims asserted by plaintiff in the complaint,

i.e., plaintiff's claims for age discrimination and facial retaliation under the ADEA, a brief in support of the motion, and a concise statement of material facts. (ECF No. 97, 98, 102.) On the same day, defendants filed their response in opposition to plaintiff's partial motion for summary judgment and a response to plaintiff's concise statement of material facts. (ECF Nos. 102, 103.) On October 3, 2013, plaintiff filed a response to defendants' concise statement of material facts and a reply to defendants' brief in opposition to her partial motion for summary judgment. (ECF Nos. 109, 113.) On October 4, 2013, plaintiff filed a brief in opposition to defendants' motion for summary judgment. (ECF No. 114.)

On October 17, 2013, the parties filed their joint concise statement of material facts with respect to plaintiff's partial motion for summary judgment. (ECF No. 116.) On November 4, 2013, defendants filed a reply to plaintiff's counter statement of facts and a reply brief with respect to their motion for summary judgment. (ECF Nos. 119, 121.) On November 6, 2013, plaintiff with leave of court filed a surreply brief in further opposition to defendants' motion for summary judgment. (ECF No. 124.) On November 8, 2013, the parties filed their joint concise statement of material facts with respect to defendants' motion for summary judgment. (ECF No. 125.)

The parties' motions for summary judgment having been fully briefed are now ripe for disposition by the court.

## II. Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## A. Plaintiff's claim that her employment was terminated based upon her age

### 1. Background

#### a. WPIC

UPMC Presbyterian Shadyside consists of UPMC Shadyside, UPMC Presbyterian, Western Psychiatric Institute and Clinic ("WPIC"), and approximately thirty to forty hospital-based clinics. (Dep. of Brian Bachowski ("Bachowski") at 53, 56 (ECF No. 111-4 at 14, 17).) Hospital-based clinics are outpatient facilities typically separate from the main UPMC Presbyterian, UPMC Shadyside, and WPIC buildings that do not have patient beds, but share UPMC Presbyterian Shadyside's Medicare certificate number, and are considered part of UPMC Presbyterian Shadyside for Medicare certification purposes. (Dep. of Bachowski at 53-56 (ECF No. 111-4 at 14-17).)

Within WPIC, there are inpatient units and ambulatory programs. (Id. ¶ 13.) Inpatient units admit patients, and ambulatory programs are akin to outpatient services. (Id.) The Diagnostic Evaluation Center (the "DEC") is one of WPIC's ambulatory programs; it is licensed as an outpatient facility and functions as WPIC's emergency room. (D.J.C.S.F. (ECF No. 125) ¶¶ 14, 15); Pl.'s Dep. at 21, 64 (ECF No. 101-1 at 6; Dep. of Eleanor Medved ("Medved") at 15, 16 (ECF No. 111-5 at 1).) The clinical administrator is the responsible manager for the DEC. (Dep. of Medved at 68 (ECF No. 111-5 at 5.) In other words, the clinical administrator is the senior leadership person who reports directly to the vice president of inpatient and emergency services. (Id.)

Dr. Cynthia Roth ("Roth") has been the president of WPIC since August 2004. (Defendants' Joint Concise Statement of Facts ("D.J.C.S.F.") (ECF No. 125) ¶ 12).)

In 2004, Eleanor Medved ("Medved") was the risk manager and director of quality for WPIC. (Dep. of Medved at 100 (ECF No. 100-2 at 7.) Between 2004 and 2005, Medved became the staff associate and vice president of ambulatory services for WPIC. (Id.) In 2008, the title "vice president of ambulatory and crisis operations" was added to Medved's job description. (Id.)

Kim Owens ("Owens") was the vice president of inpatient and emergency services for WPIC at all times relevant to this lawsuit. (D.J.C.S.F. (ECF No. 125) ¶ 18.) Owens was responsible for running the DEC. (D.J.C.S.F. (ECF No. 125) ¶ 19.)

Since 2005, Katie Devine ("Devine") has been a corporate-level vice president of human resources for UPMC. (D.J.C.S.F. (ECF No. 125) ¶ 148.) Devine is responsible for the human resources function at WPIC and across UPMC's International Commercial Services Division, its community provider services network, its home care and senior communities, and its cancer centers. (Id. ¶ 149.) Devine is a member of WPIC's executive management team. (Id. ¶ 150.) Devine was responsible for enforcing UPMC's equal employment opportunity rules and policies and for being a "check and balance" against managerial decisions that might violate those rules and policies. (Id. ¶ 151.)

**b. Plaintiff's employment with WPIC**

In or around August 1969, plaintiff began working for WPIC at the age of nineteen. (D.J.C.S.F. (ECF No. 125) ¶¶ 1, 124.) In 1971, plaintiff began working in the medical records department at WPIC. (D.J.C.S.F. (ECF No. 125) ¶ 2.) Plaintiff held various positions in the medical records department, including supervisor of the file area, hearing coordination manager, and associate director. (Id.) In 1993, plaintiff became the director of medical records at WPIC. (Id. ¶ 3.) In the late 1990s or early 2000s, the medical records department was renamed the

health information management ("HIM") department. (Id. ¶ 4.) Plaintiff was responsible for the HIM department. (Pl.'s Dep. at 19 (ECF No. 111-3 at 2).) According to plaintiff's job description, as director of the HIM department, she was expected to "organize and lead a creative multifunctional, customer-focused health information management service and central transportation service." (Pl.'s Dep. at 75 (ECF No. 101-1 at 19); D.J.C.S.F. (ECF No. 125) ¶ 8.) Plaintiff's performance evaluations identified additional responsibilities associated with her position as director of the HIM department, including, among others, "[m]onitor[ing] WPIC performance against established Corporate benchmarks and regulatory standards with regard to record completion and coding," "ensuring compliance with licensing and accrediting agency regulations," and "[m]onitoring overall performance of the WPIC HIM Department." ((ECF No. 101-2 at 6; D.J.C.S.F. (ECF No. 125) ¶ 10; Pl.'s Dep. at 97 (ECF No. 101-1 at 25).) In or around 2004 and 2005, Medved became plaintiff's direct supervisor. (Dep. of Medved at 129 (ECF No. 100-2 at 8.) The HIM department was under the direction of Medved as vice president of ambulatory and crisis operations for WPIC. (Dep. of Roth at 69 (ECF No. 111-7 at 11).) Owens was not plaintiff's supervisor. (D.J.C.S.F. (ECF No. 125) ¶ 18.)

In the forty-one years plaintiff worked for WPIC, she was never disciplined for poor performance or placed on a performance improvement plan. (D.J.C.S.F. (ECF No. 125) ¶ 125.) Plaintiff had a distinguished career with and greatly contributed to WPIC. (Id. ¶ 126.) Roth supervised plaintiff for several years and gave plaintiff good performance evaluations. (Id. ¶ 127.) Plaintiff "knew her job responsibilities very well, knew the organization very well, was extremely dedicated, competent[, and] a pleasure to work with." (Id. (Dep. of Roth at 174-75 (ECF No. 111-7 at 37).) Each year of plaintiff's forty-one years of employment with UPMC, plaintiff was rated between "consistently meets expectations" and "consistently exceeds

expectations." (ECF No. 111-11 at 2.) In 2008, plaintiff—at the age of 58—received UPMC's Award for Commitment to Excellence and Service ("ACES"), which is given to one percent of UPMC's workforce in recognition of highly distinguished performance. (D.J.C.S.F. (ECF No. 125) ¶ 133.)

### c. The HIM department

The HIM department manages all aspects of patient records, which includes overseeing, maintaining, storing, and retrieving the records, managing the various repositories and sources of documentation, and processing requests for information from those records for health care providers, insurance companies, and other persons who request information from the records. (Pl.'s Dep. at 18 (ECF No. 101-1 at 5); Dep. of Cynthia Roth ("Roth") at 69 (ECF No. 100-1 at 6).) The HIM department's responsibility to review inpatient records was different than its responsibility to review ambulatory records. (Dep. of Medved at 222 (ECF No. 111-5 at 19).) Medved testified with respect to the difference in responsibility as follows:

> The analysis for ambulatory comes in different ways, as we talked about earlier. When we have surveys for programs, that's a spot check on how we're doing with things and we discover and deal with those kinds of situations.
>
> There's a lot of reports that are generated that tell us whether we have problems with signatures, missing documents, and ill-timed documents, thing of that nature, and inpatient is an individual record going through all of the papers or whatever. I don't know if it's all of the papers or key papers for each record.

(Dep. of Medved at 222-23 (ECF No. 111-5 at 19-20).) Plaintiff described the difference in procedure followed with respect to review of medical records for inpatient and outpatient or ambulatory patients as follows:

> We had two record analysts who reviewed each inpatient discharge record, and that process included flagging any missing documents, missing signatures, which were entered into a record management system, computerized system, that would then generate a notice to the person responsible for the missing information.

For our patient [sic] or ambulatory records, you know, there were probably 40,000 to 45,000 of those services provided every month, so given budget restrictions there were not enough staff in the department to be able to look at every single document in an ambulatory record; however, probably since around the mid to late '90s a lot of the ambulatory information was entered into an electronic medical record, so we were able to monitor missing progress notes, signatures, physicians' cosignatures, missing treatment plans from that electronic system.

The other parts of the record, paper documents, it was required that they be sent to the department on a timely basis, and then we would file it into the record.

The monitoring of the record was also managed through a process that had been in place for a number of years at Western Psych where each program reviewed a sample of their records and submitted the results of those review to, you know—

I don't know if they went to their supervisors, but ultimately they were sent to the director of ambulatory services.

That person was to report any deficiencies to me so that my department would be able to follow up and monitor the completeness of those records.

(Pl.'s Dep. at 24-26 (ECF No. 101-1 at 6-7.)

Traci Cain ("Cain") was the director of ambulatory services. (Pl.'s Dep. at 26 (ECF No. 101-1 at 7.) Plaintiff's involvement in the review of the ambulatory records depended upon Cain forwarding information to plaintiff about the ambulatory records. (Pl.'s Dep. at 26-27 (ECF No. 101-1 at 7.) Cain was supposed to inform plaintiff about deficiencies in a program's medical records or if there were no deficiencies in a program's medical records. (Pl.'s Dep. at 33 (ECF No. 101-1 at 7.) Plaintiff did not recall receiving a lot of feedback from Cain about the ambulatory programs' medical records. (Id.) At one point in time, Cain prepared reports about the sampling she received from the ambulatory programs, and plaintiff reviewed the reports. (Pl.'s Dep. at 33-34 (ECF No. 101-1 at 7.) Plaintiff was not concerned about the lack of feedback she received from Cain with respect to the ambulatory programs' medical records. (Pl.'s Dep. at 34 (ECF No. 101-1 at 7.) Plaintiff explained:

I knew [Cain] to be a reliable person, so I interpreted that as there weren't any problems, and the results that I saw that she was reporting to the Joint Commission reflected that as well.

(Id.)

### 2. The 2010 investigations of WPIC and UPMC Presbyterian Shadyside

The Joint Commission is an accrediting organization that provides guidelines and standards on human resources policies and practices and voluntary accreditation for hospitals. (Dep. of Devine at 61 (ECF No. 111-8 at 12; D.J.C.S.F. (ECF No. 125) ¶ 25.) The Joint Commission performs accreditation surveys of its accredited hospitals every three years. (Id.) UPMC Presbyterian Shadyside, which includes WPIC, is a "deemed" provider because it is accredited by the Joint Commission. (D.J.C.S.F. (ECF No. 125) ¶ 22.) If a hospital is a "deemed" provider, it is "deemed" to be in compliance with the federal government's Medicare Conditions of Participation, which are standards that must be complied with in order to participate in Medicare. (Id.; Pl.'s Dep. at 177 (ECF No. 111-3 at 5).)

WPIC was subject to annual reviews by two agencies of the Commonwealth of Pennsylvania; inpatient programs were reviewed by the Pennsylvania Department of Health (the "DOH"), and ambulatory programs were reviewed by the Pennsylvania Department of Public Welfare (the "DPW"). (D.J.C.S.F. (ECF No. 125) ¶ 26.) Annual surveys by the DOH and the DPW were announced in advance to WPIC. (Id. ¶ 27.)

In addition to the annual reviews by the DOH and the DPW, the DOH performed surveys when complaints were received by telephone call or letter to the DOH. (Id. ¶¶ 28-29.) The complaint surveys were not prescheduled, and the DOH did not provide advance notice with respect to when it would conduct a complaint survey. (Id. ¶ 28.) The DOH was required to notify the Center for Medicare and Medicaid Services ("CMS") if the complaint involved a potential

violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. (Id. ¶ 30.) CMS would tell the DOH whether it was authorized to conduct a survey of the provider for violations of federal standards and regulations. (Id. ¶ 31.) Once the DOH completes a survey of a hospital, it makes a recommendation to the CMS with respect to whether the provider is in compliance with the regulations. (Id. ¶ 32.) The CMS makes the ultimate decision with respect to whether the provider was in compliance. (Id.)

On February 17, 18, and 23, 2010, the DOH conducted a complaint investigation at WPIC relating to two separate complaints it received about long lengths of stay in the DEC. (ECF No. 111-6 at 113; D.J.C.S.F. (ECF No. 125) ¶ 46.) The first complaint was investigated and determined to be unfounded. (Id.) The investigation of the second complaint involved detailed review of DEC medical records and assessment and documentation processes. (Id.)

Brian Bachowski ("Bachowski"), a surveyor with the DOH, performed the investigation of the second complaint for the DOH. (Bachowski Dep. at 10, 64-65 (ECF No. 111-4 at 2, 25-26.) Bachowski began working for the DOH as a surveyor in August 2006. (Bachowski Dep. at 10 (ECF No. 111-4 at 2.) Bachowski's responsibilities as a surveyor for the DOH included inspecting hospitals, e.g., making sure the hospitals were in compliance with federal and state laws and regulations, conducting complaint investigations, and conducting EMTALA investigations for the CMS. (Bachowski Dep. at 11 (ECF No. 111-4 at 3.) In 2009, UPMC Presbyterian-Shadyside was assigned to Bachowski, meaning Bachowski served as team leader during investigations of complaints made with respect to UPMC Presbyterian-Shadyside. (Bachowski Dep. at 29-30, 32 (ECF No. 100-3 at 10, 11; ECF No. 111-4 at 4).)

When Bachowski scheduled the survey of WPIC in February 2010, he was required to and did notify CMS about the survey because WPIC was a "deemed" provider. (D.J.C.S.F. (ECF

No. 125) ¶ 39.) CMS authorized Bachowski and his team to conduct the investigation of WPIC and to evaluate WPIC's compliance with federal regulations and standards. (Id. ¶ 40.)

The first two days of the investigation took place on February 17 and 18, 2010. (Id. ¶ 41.) While at the DEC, Bachowski, along with two other surveyors from the DOH, Judith Rich ("Rich") and Sandra Edkins ("Edkins"), questioned staff, including, among others, Owens, Jenn Schneeman ("Schneeman"), the clinical director of the DEC, and Jeremy Musher, medical director of the DEC, and looked at the flow of patients, medical records of the patient in issue in the second complaint, and medical records of current patients in the DEC. (Bachowski Dep. at 65-68 (ECF No. 111-4 at 26-29); Owens Dep. at 118 (ECF No. 111-6 at 38).) Bachowski learned the patient in issue in the second complaint "was assessed for her psychiatric issues, psychological issues, but there was a lack of evidence and documentation of her medical issues." (Bachowski Dep. at 65-66 (ECF No. 111-4 at 26-27.) Bachowski testified as follows:

> We didn't see any documentation of vital signs, we didn't see documentation that the patient state or – whatever the complaint was, that the patient obviously had not been eating for a period of time, we didn't see any evidence of lab work, we didn't see any evidence of a physical exam of the patient from a medical standpoint.
> …
> The medical screening exam was suspect….We weren't sure if there was a true medical screening exam done for the patient.

(Bachowski Dep. at 66(ECF No. 111-4 at 27.)

Bachowski had two main concerns as he conducted the survey on WPIC. (Bachowski Dep. at 73 (ECF No. 111-4 at 34.) Bachowski was concerned about the medical screening exam for the patient in issue in the second complaint. (Id.) Time was not recorded on the documentation Bachowski examined with respect to the patient's medical records so he could not tell when the medical exam of the patient was performed. (Id.) Bachowski's second concern was that "some flow sheets were being filled out for patients that would come through the DEC

that weren't becoming a part of the medical record that had information on it that would be part of the medical screening exam." (Id.)

February 23, 2010, was the third day of Bachowski's investigation at WPIC. (D.J.C.S.F. (ECF No. 125) ¶ 46.) On February 23, 2010, Bachowski interviewed "Employee 2," later identified as Owens. (Id. ¶ 47.) When Bachowski asked Owens who bore overall responsibility at WPIC for the completion of inpatient and outpatient medical records, Owens responded: "[DeCecco] is the Western Psych employee that is responsible for the health information." (D.J.C.S.F. (ECF No. 125) ¶ 49.)

On February 23, 2010, at 2:40 p.m., Bachowski interviewed plaintiff in connection with his investigation of WPIC. (Id. ¶ 51.) Two other employees from the DOH were present—but did not participate—during plaintiff's interview. (Id. ¶ 52.) Bachowski asked plaintiff how she knew whether a DEC medical record was complete. (Id. ¶ 54.) In a Form 2567 report prepared by Bachowski with respect to his investigation of WPIC, he wrote that employee 3, later identified as plaintiff, responded to his question as follows:

> "We don't do any record analysis for ambulatory programs … The DEC is an ambulatory program … We only do it [record analysis] for inpatient records … We just accept what they [DEC staff] send to us … The record review of the DEC would be the responsibility of the DEC … We are the custodian of the documents, we store everything. We aren't responsible for the DEC."

(Bachowski's Report dated 2/23/2010 at 6 (ECF No. 101-2 at 48).) Plaintiff admits she made the statements Bachowski included in his report, but argues Bachowski did not include the entirety of her statements, and "the gaps in what [she] said distorts the meaning." (Pl.'s Dep. at 204 (ECF No. 111-3 at 15.)

Plaintiff described her interview with Bachowski as follows:

I remember when I walked in he asked me to take a seat. I didn't know why. He seemed agitated, and I didn't know what had occurred prior to me arriving. Jenn Schneeman from the DEC was there.

…

[Schneeman] seemed to be leafing through some type of a binder, I guess, looking for something.

Brian asked me about a document and if I knew about it, and I believe he told me it wasn't in the record and he asked me if I knew where it was.

…

I don't remember if I even understood what document he was talking about at the time.

I [was] asked some type of a question about who was responsible for DEC records and I really didn't understand what he meant by that. He wanted to know if—

He was asking how I knew if a DEC record was complete. I told him that my department performed a detailed analysis of inpatient discharge records but that the ambulatory records which included the DEC were reviewed by the individual programs. He –

I don't remember what he said after that. He seemed more agitated and asked if I was –

I don't remember how he phrased it. He asked something about –more about who was responsible for DEC records and how –

So I just continued to explain the procedure. I told him that the ambulatory programs regularly reviewed records and turned the results of those records in, and that's how we monitored the completion of ambulatory records through those reviews.

Jenn Schneeman was there and confirmed that was the process. He wanted to know –

I think he must have asked me something about why this document that he was looking for wasn't in the record, and I told him that if the DEC had sent it to us then it would have been filed so it could only mean that it had never been received.

(Pl.'s Dep. at 186-88 (ECF No. 111-3 at 6-8).) According to plaintiff, Bachowski appeared angry and as if he was not listening to plaintiff during the interview. (Pl.'s Dep. at 192 (ECF No. 111-3 at 12).) Plaintiff explained:

[Bachowski] didn't ask me any questions about the process; he had his head pretty much buried in a chart. He was looking at a chart the entire time almost. He didn't make much eye contact with me.

…

He didn't ask me any questions. He didn't tell me it wasn't satisfactory. He just kept repeating the same question about who is responsible for the completion of DEC records, and he didn't ask me any questions about the procedure I had explained to him.

…

His facial expressions looked angry. I believe at one point he even, you know, pounded his hand on the table, you know.

(Pl.'s Dep. at 192-94 (ECF No. 111-3 at 12-14).)

Plaintiff testified that Owens arrived at the interview at some point after plaintiff explained the record review process to Bachowski. (Pl.'s Dep. at 188 (ECF No. 111-3 at 8).) Once Owen arrived, Bachowski repeated his questions about the record review process to plaintiff. (Pl.'s Dep. at 188-89 (ECF No. 111-3 at 8-9).) Plaintiff again tried to explain to Bachowski the record review process that was put into place by Medved, but "[Bachowski] didn't appear to want to hear about that." (Id.) Plaintiff does not remember telling Bachowski that she was not responsible for the DEC. (Id.) Plaintiff testified that the statement Bachowski included on the Form 2756 with respect to her not being responsible for the DEC was incomplete. (Pl.'s Dep. at 189-90 (ECF No. 111-3 at 9-10).) According to plaintiff, Owens asked Bachowski what plaintiff and he were talking about. (Pl.'s Dep. at 190 (ECF No. 111-3 at 10).) Bachowski "repeated a few things" to Owens, and then asked her who was administratively responsible for medical records. (Id.) Owens told Bachowski that plaintiff was administratively responsible for medical records. (Id.) Plaintiff agreed with Owen's statement subject to the process she described to Bachowski that was set in place by Medved. (Pl.'s Dep. at 190-91, 205 (ECF No. 111-3 at 10-11, 16).)

Following Bachowski's survey of WPIC, including his interview with plaintiff, his team members and he prepared a "Form 2567" report containing information which formed the basis of Bachowski's recommendation that WPIC had condition-level deficiencies violating the requirements of 42 C.F.R. § 489.24 and related requirements of 42 C.F.R. § 489.20. (Dep. of Bachowski at 75-78 (ECF No. 111-4 at 36-39); (ECF No. 101-2).) A Form 2567 is a survey report outlining the findings of an investigation. (D.J.C.S.F. (ECF No. 125) ¶ 62.) The Form 2567 with respect to Bachowski's survey of WPIC in February 2010 contained information with respect to:

- The condition-level deficiencies Bachowski and his team found as a result of the investigation;

- Policies Bachowski and his "team reviewed and deemed to be germane to the investigation[;]"

- "Observations of the content of medical records that were pulled for purposes of [Bachowski's] survey[;]" and

- "Statements made by various witnesses in the course of witness interviews[.]"

(Dep. of Bachowski at 77-78 (ECF No. 111-4 at 38-39).)

If a deficiency is identified during a survey of a facility, the surveyor includes statements made that support the deficient practice in the CMS Form 2567. (Bachowski Dep. at 97 (ECF No. 111-4 at 58).) Bachowski testified that mitigating statements are put into the Form 2567 report, "but per CMS and Department of Health for the purpose of the deficiency we were instructed not to put that extraneous information or mitigating—So if they disagreed with something, typically that would not go in here." (Id.) Bachowski testified that he used ellipses on the CMS Form 2567 to signify extraneous comments made by plaintiff during the interview on February 23, 2010. (Bachowski Dep. at 92 (ECF No. 111-4 at 53).) Bachowski explained that he

did not record the extraneous comments because "[t]hey weren't pertinent for the purpose of what we were trying to validate or convey in relation to the deficiency." (Id.) Bachowski testified:

- Plaintiff's comments were problematic because "she was the director of the HIM department, and as the director of the HIM department, she told us that she did not have responsibility for those forms that were being housed in the filing cabinets, they were not being made part of the medical record;"

- Plaintiff's comments were a significant part of why a condition-level deficiency was found;

- He would have recommended a deficiency even if plaintiff did not make those comments; and

- There is nothing plaintiff could have told Bachowski on February 23, 2010, "to stop the recommendation for condition-level violation."

(Bachowski Dep. at 133-34, 177, 209-10 (ECF No. 100-3 at 44-45; ECF No. 111-4 at 66-67, 105.)

WPIC was advised about the condition-level deficiencies in a letter dated March 2, 2010, from CMS Principal State Representative Dale Van Wieren to John Innocenti ("Innocenti") from UPMC. (D.J.C.S.F. (ECF No. 125) ¶ 69.) The letter provided:

- "If, in the course of [a Joint Commission survey of a hospital], a hospital is found not to meet one or more of the Medicare Conditions of Participation, the hospital will no longer be deemed to meet any Medicare Conditions of Participation…[and the DOH is] required to keep the hospital under Medicare State agency jurisdiction until it is in compliance with all Medicare Conditions of Participation." (ECF No. 101-2 at 68);

- "Based on the Pennsylvania Department of Health report of deficiencies found during the complaint investigation survey of [WPIC] on February 23, 2010, it has been found that UPMC Presbyterian Shadyside is not in compliance with…42 C.F.R. § 482.24 – Medical Record Services." (Id.);

- The DOH "determined that UPMC Presbyterian Shadyside will no longer be deemed to meet the Medicare Conditions of Participation and will be subject to the federal requirements applied to unaccredited hospitals." (Id.);

- UPMC Presbyterian Shadyside could file a plan of correction for the cited deficiencies. (Id.);

- UPMC Presbyterian Shadyside would be subject to a "complete Medicare survey of the hospital to evaluate its compliance with all Medicare Conditions of Participation." "After the completion of that survey [UPMC Presbyterian Shadyside] will be required to submit an acceptable plan for correction of all of the deficiencies identified during the complete Medicare survey and the complaint investigation." (Id. at 69); and

- "The finding that the UPMC Presbyterian Shadyside is not in compliance with the Conditions of Participation does not affect your hospital's accreditation, its Medicare payments, or its current status as a participating provider of hospital services in the Medicare program."(Id.)

On a day following February 23, 2010, after Innocenti received the citations from the DOH, plaintiff met with Medved. (Pl.'s Dep. at 215 (ECF No. 111-3 at 20).) During the meeting, Medved and plaintiff reviewed the citations. (Id.) Medved wanted to know if the quotations with respect to what plaintiff told Bachowski were accurate. (Id.) Medved did not think the quotations sounded like a response that plaintiff would have given. (Id.) Plaintiff told Medved the quotations were incomplete and distorted the meaning of what she told Bachowski. (Id.) Plaintiff and Medved discussed the plan of correction process and that plaintiff would be involved in the plan of correction process. (Id.)

### 3. EMTALA Investigation

Following the investigation on February 17 and 18, 2010, the DOH survey team, i.e., Bachowski, Rich, and Edkins, contacted the CMS and informed the CMS that an EMTALA investigation was necessary at the DEC. (Bachowski Dep. at 171-72 (ECF No. 111-4 at 99-100.) The CMS gave the DOH permission to conduct an EMTALA investigation at the DEC. (Bachowski Dep. at 172 (ECF No. 111-4 at 100.) The EMTALA investigation began on February 23, 2010, and ended on February 24, 2010. (D.J.C.S.F. (ECF No. 125) ¶ 71; ECF No.

111-4 at 168.) Based upon the result of the EMTALA investigation, the CMS determined UPMC Presbyterian Shadyside violated the requirements set forth in 42 C.F.R. §§ 489.20 and 489.24. (ECF No. 111-4 at 166.).) A Statement of Deficiencies prepared by the DOH as a result of the EMTALA investigation provided that UPMC Presbyterian Shadyside failed to meet the requirements set forth in §§ 489.20 and 489.24 because UPMC Presbyterian Shadyside:

> [1] failed to provide an appropriate medical screening examination [] within the capability of the hospital's emergency department…for one of 27 medical records reviewed…and [2] failed to monitor patients prior to the determination whether or not the patient had an emergency medical condition for nine of 27 medical records reviewed.

(ECF No. 111-4 at 169.) The CMS determined UPMC Presbyterian Shadyside's deficiencies were "so serious that they constitute[d] an immediate threat to the health and safety of any individual who [may come] to the emergency department and request examination or treatment for an emergency medical condition." (ECF No. 111-4 at 166.) The CMS planned to terminate UPMC Presbyterian Shadyside's participation in the Medicare program on March 27, 2010, unless UPMC Presbyterian Shadyside submitted an approved plan of correction or "successfully prov[ed] that the deficiencies did not exist prior to the projected public notification date." (Id.) The DOH did not interview plaintiff in connection with its EMTALA investigation. (Pl.'s Dep. at 208-09 (ECF No. 111-3 at 19-20.) WPIC was advised of its violations of EMTALA by a letter dated March 4, 2010, from CMS Certification and Enforcement Branch Manager, Timothy Hock, to Innocenti. (D.J.C.S.F. (ECF No. 125) ¶ 74.)

### 1. The follow-up complaint investigation of UPMC Presbyterian Shadyside, not including WPIC

The condition-level deficiency noted in the March 2, 2010 letter from CMS to Innocenti was corrected for federal Medicare purposes on March 16, 2010, when the DOH and CMS accepted UPMC Presbyterian Shadyside's plan of correction for that condition-level deficiency.

(Bachowski Dep. at 201-04 (ECF No. 111-4 at 108-111); ECF No. 111-4 at 217.) The Medicare recertification survey of UPMC Presbyterian Shadyside, not including WPIC, which was already cleared as compliant by the DOH, occurred in April 2010. (ECF No. 111-9 at 22.) Bachowski conducted the recertification investigation. (D.J.C.S.F. (ECF No. 125) ¶ 78.) Deficiencies were found in the following areas of UPMC Presbyterian Shadyside as a result of the recertification survey: (1) restraint use; (2) RN supervision of nursing care; (3) unified medical record service; (4) form and retention of records; (5) orders dated and signed; (6) security of medications; (7) unusable drugs not used; (8) periodic equipment maintenance; (9) director of dietary services; (10) discharge planning needs assessment; and (11) operating room policies. (ECF No. 111-9 at 22.)

### 2. Plaintiff's performance evaluation dated March 1, 2010

Part of Medved's job responsibilities as vice president of ambulatory operations was to evaluate employees under her supervision. (Dep. of Medved at 129-30 (ECF No. 111-5 at 12).) Medved was serious about her job. (Dep. of Medved at 129 (ECF No. 111-5 at 12).) Medved was plaintiff's direct supervisor and conducted plaintiff's annual performance reviews. (Id.) Medved followed UPMC's Performance Management Policy (the "policy") with respect to plaintiff's evaluations. (D.J.C.S.F. (ECF No. 125) ¶ 96.) Pursuant to the policy, UPMC "measure[d] and reward[ed] employee performance in support of the provision of outstanding patient care, education and research." (ECF No. 111-5 at 61.)

Under the policy, managers must identify and correct all performance deficiencies in a timely and consistent manner. (ECF No. 111-5 at 61.) Any staff member found to have serious performance deficiencies must be placed on a performance improvement plan. (Id. at 64.) If there are performance deficiencies, the reviewing manager must document them in the

employee's performance review, notify the employee about the need to improve, and establish expectations for performance improvement. (Id. at 61.) The manager is required to "note on the performance review any corrective action for the review period and indicate that it may impact the staff member's performance rating." (Id. at 64.) Reviewing managers assign individual performance ratings for the employee on each metric in the performance evaluation. (D.J.C.S.F. (ECF No. 125) ¶ 99.) Reviewing managers must determine the appropriate merit raise—if any— and then meet with the employee to discuss performance results, acknowledge performance that exceeds, meets, or does not meet expectations, and work on a development plan for the future. (Id.) Merit raises had to be reviewed and approved by the reviewing supervisor and the reviewing supervisor's supervisor. (D.J.C.S.F. (ECF No. 125) ¶ 100.) Employee performance reviews at UPMC are a serious matter because "[p]eople need to know where they stand." (D.J.C.S.F. (ECF No. 125) ¶ 101.) Roth expected to see concerns about her own performance documented in her performance review. (Id. ¶ 102.) Plaintiff's performance reviews were the best sources of information—"at a high level"—with respect to how Roth viewed plaintiff's performance. (Dep. of Roth at 177 (ECF No. 111-7 at 39).)

On March 15, 2010, Medved wrote Roth an email with respect to plaintiff's performance evaluation. (ECF No. 111-5 at 110.) Medved wrote:

> Claudia, when I do [plaintiff's] eval, I usually contact corporate HIM as there are things such as (transcription, etc) that occur more on the corporate level—requesting performance feedback.
>
> 2 questions:
> All things considered are you okay with me doing so again this year—I need to get Diane's [employee performance review] done
> If yes, do you know who the appropriate corporate contact would be at this time?

(ECF No. 111-5 at 110.) On the same day, Roth responded to Medved's email, writing:

Let's discuss when we meet…I think it is Wednesday. Is that ok to wait? I would like to hear about your discussion with [plaintiff] last week, as it may influence my decision.

(Id.) Less than one minute after sending the first response, Roth sent the following response to Medved's email:

PS, Denise's eval is currently due. When Katie and I discussed the need to impose a disciplinary plan, she was able to remove Denise from the "due" list, pending my actions. I could ask her to do the same with Diane. Let me know.

(ECF No. 111-5 at 111.) Medved responded to Roth's second response email, writing: "In fairness to her would prefer. It was due 3-1. Would be great." (Id.) Roth instructed Medved via email to "Call Katie and ask her to do what she did with Denise." (Id.)

On March 16, 2010, Medved sent Devine a blank email with the following in the subject line of the email: "when you have a minute can we discuss Diane dececco [sic][?]" (ECF No. 111-5.) At some point in time, Medved asked Devine "for more time to do [plaintiff's] evaluation because [Medved] wanted to put more thought into it to address some issues." (Dep. of Devine at 261 (ECF No. 111-8 at 97.)

On April 27, 2010, Medved sent Devine a draft of the performance evaluation she prepared for plaintiff. (D.J.C.S.F. (ECF No. 125) ¶ 108.) On April 28, 2010, at 8:05 a.m., Medved sent an email to Devine that did not contain any text in the body of the email but provided the following in the subject line of the email: "Hi—do you have time to discuss Diane today?" (ECF No. 111-5 at 115.) Medved and Devine decided to meet at 11:00 a.m. on April 28, 2010. (Id.) Devine emailed Medved to confirm the 11:00 a.m. meeting and wrote: "I did get a chance to read the review in union negotiations yesterday. You did a nice job on the goal section." (Id.) Devine approved Medved's performance evaluation of plaintiff. (D.J.C.S.F. (ECF No. 125) ¶ 112.)

On April 30, 2010, Medved delivered to plaintiff her performance evaluation, which included a list of six goals for plaintiff to achieve in 2011, which was the upcoming work year. (D.J.C.S.F. (ECF No. 125) ¶ 113.) Medved "was extremely supportive" and genuine when she delivered the performance evaluation to plaintiff. (Pl.'s Dep. at 308-309 (ECF No. 101-1at 77-78.) The performance evaluation addressed plaintiff's performance from September 1, 2008, through April 30, 2010. (Id.) Medved and plaintiff each signed the performance evaluation on April 30, 2010. (Id.)

The performance rating key for the performance evaluation was as follows:

- A rating of "3" was the highest rating available; it meant the employee "Consistently exceed[ed] expectations;"

- A rating of "2" was the second highest rating available; it meant the employee "Consistently meets expectations;" and

- A rating of "1" was the lowest rating available; it meant the employee "[Did] not consistently meet expectations and improvement is needed."

(ECF No. 111-5 at 117.) Plaintiff received ratings for her 2010 goals, job responsibilities, competencies and behaviors, and overall performance. (ECF No. 111-5 at 116-32.) Plaintiff received the following ratings for her performance with respect to her 2010 goals:

- "Work with VP on establishing challenges that will strengthen your visibility and impact on WPIC operations and enhance satisfaction by providing variability and empowerment in your role."—**1.75**;

- "Focus on WPIC customer satisfaction through strategic planning."—**1.75**;

- "Continue to gather information as to planning for system change relative to HIM and create proactive strategy"—**2**;

- "Participate in the implementation of HPF in the registration process and insure the application provides the level of security needed to behavioral health information."—**2**;

- "Participate as a consultant in the expansion of dbMotion to include behavioral health information to insure appropriate security measures are in place."—**2**;

- "Assist with roll-out of new IMS Privacy Audit Tool to WPIC managers."—**2**;

(ECF No. 111-5 at 119.)

Plaintiff received the following ratings for her job responsibilities:

- "Monitor overall performance of the HIM Department; insure high quality service and customer satisfaction"—**1.75**;

- "Monitor WPIC performance against established Corporate benchmarks and regulatory standards with regard to record completion and coding"—**1.75**;

- "Monitor the completion of chart reviews as required by WPIC policy and JCAHO"—**2**;

- "Monitor changes in work flow and work volumes to insure an efficient operation and quality support services"—**2**;

- "Monitor Department operating budgets"—**2.5**;

- "Participate as a member Corporate Information Privacy and Security Committee (ISPC)"—**2**;

- "Monitor overall performance of the UPMC Transcription Service"—**2.5**;

- "Coach and support the management staff of the Transcription Service"—**3**;

- "Develop and Implement changes that will maintain skilled transcriptionists and enhance recruitment activity"—**2.5**; and

- "Perform duties of the WPIC Privacy Officer"—**2.5**.

(Id. at 120-22.) With respect to plaintiff's responsibility to "[m]onitor WPIC performance against established Corporate benchmarks and regulatory standards with regard to record completion and coding," Medved commented:

Record analysis and completion function have been on target as stated relative to inpatient. System evolution requires that we reevaluate current operations relative to ambulatory records management to assure consistency across services and UPMC with this regard, thus needing to expand and continue this goal with recent developments in raising the bar which Diane has committed to and demonstrated commitment to.

(ECF No. 111-5 at 120.)

With respect to plaintiff's competencies and behaviors, she received the following ratings: accountability—**2**; communications—**2**; customer service—**1.75**; flexibility—**2**; and judgment/decision-making—**2**. (Id. at 123-25.)

The performance evaluation defined "accountability" as, among other things, "[t]akes responsibility for own actions" and "[r]ecognizes own strengths and weaknesses and seeks/accepts constructive feedback, incorporating it into work." (Id. at 124.) Medved provided the following comments with respect to plaintiff's accountability: "Agree with Diane's comments though need to attend to all elements of effective program management in upcoming period beyond scope of previously acceptable standards." (Id.) Plaintiff commented with respect to accountability: "Excellent attendance. Consistently meets time commitments. Effectively manages HIM and Transcription operations. The size of the transcript operation has expanded significantly over the past year which added an additional 41 staff." (Id.)

The performance review defined "Judgment/Decision-Making" as, among other things, "[e]xhibits sound and accurate judgment." (ECF No. 111-5 at 125.) Medved commented as follows with respect to plaintiff's judgment and decision-making: "Need also to establish mechanism to ask for help when needed in order to proactively address any concerns." (Id.) Plaintiff commented as follows with respect to her judgment and decision-making: "Consistently demonstrates sound judgment. Includes appropriate staff in decision-making. Directs managers to find the root cause of problems." (Id.)

The performance review defined "communications" as, among things, "[e]ffectively expresses ideas verbally and in writing" and "[s]elects/uses appropriate communication methods." (ECF No. 111-5 at 124.) Medved commented as follows with respect to plaintiff's communication skills: "Need to work together to assure that various stakeholders recognize implications of process change with respect to practice and regulation via various communication strategies." (Id.) Plaintiff commented as follows with respect to her communication skills: "Demonstrates ability to successfully communicate with staff and customers. Experienced at resolving customer complaints. Prepared and delivered a presentation to transcription staff regarding a significant compensation change which was positively accepted." (Id.)

In the "Development Plan" portion of the performance evaluation, Medved wrote:

Diane has a strong knowledge base of HIM operations, applicable regulations and consistently promotes the interests of protecting confidentiality of patient health information. **This past year has possibly been the most challenging for Diane, relative to difficult performance during a DOH interview/survey relative to scope of oversight of HIM. There are many system initiatives and requirements (new and existing) that are in play that directly and indirectly affect HIM. Additional requirements have emerged relative to the need for better system integration and consistency of application of standards set forth in regulatory requirements. In the past several weeks Diane has overextended herself appropriately so to improve document management in specified areas, such as the DEC.** She has served as consultant to CIM and Benedum Geriatrics as well as has personal oversight of DEC records management as it pertains to her department with very good results. **Diane has also been able to mobilize her staff to also rise to the occasion in this effort that was most impressive.** Diane has recruited an associate director in this past year and continues to work on her development. Diane is very organized and meets commitments, albeit redefined for this upcoming period. Diane is respectful and demonstrates the value of the organizations' mission and vision. Diane can easily identify problems (and in detail) associated with proposed changes and is working on assertive articulation of these goals that she must be persistent with. Diane has served as the conduit between WPIC and UPMC functions such as Transcription (with solid results) and participation in WPIC and Corporate workgroups and projects, Corporate Compliance and various application groups within ISD, WPIC ISD Steering Committee, RAC Audits, formed the Taskforce

to review copy/paste use in the HER and develop guidelines. Directed the integration of four transcription departments from other UPMC facilities which included an additional 41 staff under the UPMC Transcription Services Department. **We are confident that Diane possesses the skill and talents to take the HIM Department to the next level.**

(ECF No. 111-5 at 127) (emphasis added.)

The overall performance rating is a mathematical calculation based upon the ratings given for each of the employee's job responsibilities. (Dep. of Medved at 345 (ECF No. 100-2 at 33).) Plaintiff's overall rating on the performance evaluation dated March 1, 2010, was 2.12. (Id. at 117.) An overall rating of 2.12 qualified plaintiff for a 1.50-2.50 percent merit raise and indicated plaintiff was a "Solid/Strong/Good Performer." (ECF No. 111-5 at 133.)

Medved testified that she did not expect to see a year-to-year drop in overall performance rating of managers that reported to her. (Dep. of Medved at 346 (ECF No. 100-2 at 34).) Plaintiff's overall performance ratings for the years leading up to 2010 were as follows:

- September 1, 2005: **2.66-2.67** (ECF No. 111-5 at 67);

- September 1, 2006: **2.62** (Id. at 74);

- September 1, 2007: **2.48** (Id. at 86); and

- September 1, 2008: **2.434** (Id. at 96).

Medved testified that she believed the overall performance rating of the managers that reported to her should be "[b]etween 2.5 and 2.7 somewhere to a three." (Id.) Medved testified that she was supposed to and did record plaintiff's "performance problems" in her performance evaluation. (Dep. of Medved at 292 (ECF No. 111-5 at 36).)

Medved included an "HIM work plan" with plaintiff's performance evaluation. (Dep. of Medved at 347 (ECF No. 125 at 53).) The HIM work plan was "a document that outlined everything that needed to be done to conduct a program review of the health information

management department." (Dep. of Medved at 347-48 (ECF No. 125 at 36).) The program

review included "looking from top to bottom, policies and procedures, staffing, space, budget, to

review the entire program" in the HIM department. (Id.) Medved would not include an HIM

work plan with an employee's performance review if the employee was adequately performing.

(Id.) Requiring a program review may be the result of "multiple bad events, it could be seriously

poor performance in a regulatory review, it could be chaos, it could be lots of turnover. Basically

it's something that symbolizes the program as unstable and needs attention." (Dep. of Medved at

352-53 (ECF No. 111-5 at 49).)

On April 30, 2010, at 9:29 p.m., Medved sent an email to Roth and Devine, which read:

> Thank you both for all of your assistance. I met with Diane to review the letter
> yesterday and did her EPR today. She reacted as any of us would have but
> remained quite professional. I asked Diane If [sic] she felt her evaluation was fair
> and she acknowledged that it was. Gave her commitment that she had our support
> and that we have the confidence that she can and will take HIM to the next level.
> She appreciated this and affirmed she will do so.

(ECF No. 111-5 at 134.)

Roth, as a "golden rule," reads her emails from the day before she goes to sleep, and pays

special attention to emails from Medved and Owens because they are her vice presidents.

(D.J.C.S.F. (ECF No. 125) ¶ 122.) If Medved or Owens "said something that Roth disagreed

with, Roth would express her disagreement." (Id.) Roth believed Medved was a competent

evaluator of employees. (Id. ¶ 123.)

### 3. Decision to Terminate Plaintiff's Employment

#### a. Plaintiff is informed about her termination

On June 1, 2010, plaintiff was notified about her termination by Medved and Devine in Medved's office. (Pl.'s Dep. at 220 (ECF No. 101-1 at 55).) Medved's role during the meeting was to address the reason for plaintiff's termination; Devine's role during the meeting was to review with plaintiff a Separation Agreement and General Release defendants provided to their employees and to address plaintiff's questions with respect to benefits. (Dep. of Devine at 205 (ECF No. 111-8 at 92).) Medved informed plaintiff that the executive staff of WPIC and other people outside of WPIC lost faith in plaintiff's ability to lead and that her employment was being terminated. (D.J.C.S.F. (ECF No. 125) ¶ 88); (Dep. of Devine at 206 (ECF No. 111-8 at 93-94.) Plaintiff learned that June 18, 2010, was her last day of work. . (D.J.C.S.F. (ECF No. 125) ¶ 88.) Plaintiff was fifty-nine years old at the time she was fired. (D.J.C.S.F. (ECF No. 125) ¶ 94.)

### b. Final decision maker

#### i. UPMC documents

In UPMC's position statement to the EEOC dated September 30, 2011, UPMC wrote that Roth and Medved consulted with Devine with respect to whether plaintiff's employment should be terminated, and that "all three women agreed that [plaintiff's] employment should be terminated." (ECF No. 111-11 at 12.) In an additional letter provided to the EEOC from UPMC, UPMC wrote: "The decision to terminate [plaintiff's] employment was made by Claudia Roth, President, age 44, Ellie Medved, Vice President, age 45, and Katie Devine, Vice President of Human Resources, age 52." (ECF No. 111-11 at 5.) In UPMC's response to plaintiff's interrogatories, it identified Roth, Medved, and Devine as the final decision-makers with respect to the decision to fire plaintiff. (ECF No. 111-11 at 15.)

#### ii. Roth

Roth testified that she was the final decision maker with respect to UPMC's decision to fire plaintiff, and described Medved's and Devine's roles in the process as follows:

> They informed me of the circumstances and Ellie as Diane's direct supervisor, obviously was involved in that capacity and anything of that magnitude related to an HR matter would involve Katie.

(Roth Dep. 189-190 (ECF No. 111-7 at 51.) Roth testified that she also spoke with her boss, Liz Concordia ("Concordia"), about her decision to fire plaintiff, and that Concordia concurred with her decision to fire plaintiff. (Roth Dep. 230-34 (ECF No. 111-7 at 70-74.) Plaintiff's counsel questioned Roth about her discussions with Concordia, and the following exchange took place:

Q….Was the decision to terminate [plaintiff] made for you by Liz Concor[d]ia?

A. I do not recall it that way.

Q. Well, she's your boss; right?

A. Correct.

Q. Am I correct that she's the number two behind Jeffrey Romoff kind of?

A. She's in a very high level position.

Q. Now, if she's telling you that she's not got confidence in Diane Dececco [sic] going forward in time, what are you going to do in response to that?
…
A. She was supporting me.
…
Q….And if you had said [to Concordia], let's say you had been of the view it's fixable, it's no problem, miscommunication, Kim Owens told me that she didn't really think Diane understood the question, the surveyor was not quoting and there are things dot dot dot that were left out, important things contextually, I think that Diane can continue in her role as the HIM director and Liz Concordia had responded to you by saying no, I have lost confidence, is Diane Dececco's [sic] fate essentially sealed in that situation?

A. I don't know.
…
Q. Well, if you heard your boss say that, what would you do?

A. We have a relationship that we – we have a very open communication style between us and we put everything on the table and actually it's a culture where subordinates are respected by pushing back if they feel strongly about something and that is the relationship I have with Liz.

(Roth Dep. 235-37 (ECF No. 111-7 at 75-77.)

Roth learned about plaintiff's performance in the interview with Bachowski from Owens and Bachowski's written report. (Dep. of Roth at 192-93 (ECF No. 111-7 at 54-55).) Owens told Roth that Owens tried to "finesse" the situation between plaintiff and Bachowski by helping plaintiff understand Bachowski's question so that plaintiff could give Bachowski the appropriate answer. (Dep. of Roth at 196 (ECF No. 111-7 at 58).) Roth testified that the appropriate answer to Bachowski's question was that the DEC's medical records were "within [plaintiff's] realm of responsibility." (Dep. of Roth at 196 (ECF No. 111-7 at 58).)

### iii. Medved

Medved testified that she was "one of a couple of people" along with Roth and Devine that made the decision to terminate plaintiff's employment with UPMC. (Dep. of Medved at 190 (ECF No. 111-5 at 18.) Medved testified that Roth first said they needed to discuss whether plaintiff should be fired, but that all three of them—Roth, Devine, and Medved—came to an agreement that plaintiff should be fired. (Dep. of Medved at 322-32 (ECF No. 111-5 at 43).)

### iv. Devine

Devine testified that Medved and she "talked with [Roth] about options, and there was a vote of no confidence in [plaintiff] leading the department, and that at that point it was decided that we would terminate her employment." (Dep. of Devine at 142 (ECF No. 111-8 at 40).) According to Devine, Roth, Medved, and she made the decision to terminate plaintiff's employment. (Dep. of Devine at 191 (ECF No. 111-8 at 83).)

Devine testified that she did not personally speak to plaintiff about her performance during the February 23, 2010 interview with Bachowski because "[t]hat's not [her] area of expertise. [She] relied on those who are subject matter experts to tell me about it." (Dep. of Devine at 152 (ECF No. 111-8 at 47).) When plaintiff's counsel asked Devine whether she did anything "to verify or at least insure [her]self that [defendants' EEOC] policy was being abided by during this course of events[,]" Devine responded: "I spoke to people who were directly involved and included in those reviews that led to this, so they observed -- They were direct observers." (Dep. of Devine at 153 (ECF No. 111-8 at 48).) Devine "believed from their discussions that they were not in violation [of defendants' EEOC policy]." (Dep. of Devine at 154 (ECF No. 111-8 at 49).) Devine explained why she relied upon her discussions with Roth and Medved during the decision-making process to fire plaintiff as follows: "They're the experts in this field. If I had talked to Diane, I would not have understood what is a correct answer, what is an incorrect answer, how any of that should have been handled." (Dep. of Devine at 155 (ECF No. 111-8 at 50).)

Devine did not review the letters dated March 2, 2010, and March 4, 2010, from CMS to UPMC prior to UPMC deciding to terminate plaintiff's employment. (D.J.C.S.F. (ECF No. 125) ¶ 152.) Devine did not speak to or interview plaintiff about plaintiff's interview with Bachowski prior to UPMC terminating her employment. (Id. ¶ 153.)

### c. UPMC's reasons for terminating plaintiff[1]

---

[1]     On April 9, 2010, Medved received an anonymous complaint letter from an employee in the HIM department detailing deficiencies in plaintiff's leadership of the HIM department. (ECF No. 100-2 at 47.) Medved faxed the letter to Devine. (Dep. of Devine at 167 (ECF No. 111-8 at 61).) WPIC did not investigate the allegations contained in the letter. (ECF No. 111-11 at 12; Dep. of Devine at 167 (ECF No. 111-8 at 61).) Devine testified: "[I]t's an anonymous letter and our feeling is if you want to make these statements, you need to come forward. We'll certainly investigate something like this, but we don't really put value on anonymous." (Dep. of Devine at

### i. UPMC[2]

In UPMC's position statement to the EEOC dated September 30, 2011, UPMC wrote

plaintiff was fired "as a direct result of her failure in the audit process," explaining:

> Complainant's statements to the DOH, coupled with the utter disarray of WPIC's
> Health Information Management department, subjected WPIC and UPMC
> Presbyterian-Shadyside to the potential loss of millions of dollars in Medicare and
> Medicaid reimbursement…. Complainant's dismal performance during the audit
> warranted her immediate termination of employment.

(ECF No. 111-11 at 8, 13.) In UPMC's response to plaintiff's first set of interrogatories, UPMC

wrote plaintiff was fired

> because of poor work performance in responding to a Department of Health Audit
> ("DOH") survey at WPIC which occurred in February 2010. Specifically,
> Plaintiff's ill-conceived responses to the DOH surveyors, coupled with the
> general disarray in the Health Information Management ("HIM") Department at
> WPIC led to the DOH reporting its survey results to the Center for Medicare and
> Medicaid Services ("CMS") which, in turn, required UPMC Presbyterian
> Shadyside (which includes WPIC) to implement a plan of correction and to
> submit to further surveys and audits.

---

167 (ECF No. 111-8 at 61).) Medved showed plaintiff the anonymous letter one or two days
before plaintiff's final evaluation. (Pl.'s Dep. at 240 (ECF No. 111-3 at 21).) Plaintiff did not
know who wrote the letter, but she suspected that it could possibly be Susan Growden
("Growden"). (Pl.'s Dep. at 240-41 (ECF No. 111-3 at 21-22).) Plaintiff explained:

> I hadn't known Susan that long, only about six months or so, and I had had
> several issues with her with the way she handled employees in the department,
> one specifically where she said something inappropriate to an employee who
> came and complained to me, and I spoke with Susan and she denied it.
>
> There was another employee present. They both put statements in writing
> documenting what Susan said.
>
> I discussed it with human resources. They just told me to document it and I wasn't
> allowed to take any other action.

(Pl.'s Dep. at 241 (ECF No. 111-3 at 22).) Medved agreed with plaintiff's suspicions that
Growden wrote the letter. (Pl.'s Dep. at 240-41 (ECF No. 111-3 at 21-22); Dep. of Medved at
331 (ECF No. 111-5 at 45); ECF No. 111-5 at 139).)

[2] When a UPMC employee has been grossly negligent, UPMC takes immediate action without
providing notice or an opportunity to improve. (D.J.C.S.F. (ECF No. 125) ¶ 144.)

(ECF No. 111-11 at 16.)

### ii. Roth

With respect to the reason plaintiff was terminated, Roth testified:

An egregious event occurred. Her egregious actions could have cost not only Western Psych, but UPMC, WPIC—I'm sorry, Presbyterian, et cetera, not only our license, licenses, numerous contracts. Essentially could have put us out of business.

…

[Plaintiff's comments to Bachowski] led to a further – had Diane not negated her responsibility for the management of health information in the emergency department, in the DEC, the ensuing investigation would not have commenced.

…

When asked if she was responsible for information, health information management in the DEC, she denied responsibility for oversight for ambulatory HIM.

…

[Owens attempted to help plaintiff, but plaintiff] stuck to her initial response.

(Dep. of Roth at 191, 192, 195 (ECF No. 111-7 at 53, 54, 57).)

### iii. Medved

With respect to the reason plaintiff was terminated, Medved testified:

[Plaintiff was fired because she] indicated that she had no responsibility for the HIM function for the DEC; therefore, there's no oversight for the HIM function which is required by CMS and DOH.

…

Ultimately, her failure to perform as expected during a review of that nature, and, I mean, the comment and the meaning of the comment, as well.

…

Diane/HIM is responsible for the medical records at Western Psych and, therefore, her saying that she's not responsible for them was the reason that she was personally terminated.

…

The fundamental issue is that she had an opportunity to communicate the infrastructure that was in place that would reinforce to the surveyors that we had an adequate HIM function in place regardless of whether or not a program was deviating from the practices, but the issue was she did not as a leader of the organization say we have an HIM function and here's all of the things that are in place that go across our organization that demonstrate we have an HIM function in place that meets the regulations.

(Dep. of Medved at 161-62, 219. 248 (ECF No. 111-5 at 17, 19, 26).) Medved did not know if plaintiff was misquoted in Bachowski's report with respect to the complaint investigation dated February 23, 2010, or if something she said was left out of the report. (Dep. of Medved at 224 (ECF No. 111-5 at 20).)

### 4. Roth's preference for youth

On June 14, 2011, Roth sent an email to Devine seeking employment assistance for Elyse Averback ("Averback"), who Roth described as a "young lady" who Roth personally knew. (ECF No. 100-1 at 34.) On August 11, 2010, Roth sent an email to Devine and Medved with respect to Julie Truver ("Truver"), who applied for a position with UPMC. (ECF No. 100-1 at 35.) Roth described Truver as a "young wom[a]n." (Id.) On February 17, 2011, Roth sent an email to Medved, Owens, and Doug Henry about Maya Tobe, who Roth described as a "young woman" who was "lovely, bright, and driven...with a passion for Behavioral Health." (ECF No. 100-1 at 36.) On January 11, 2012, Roth sent an email to Mary Austin and Stephen Nimmo with respect to Katie Pakler ("Pakler"), who Roth described as a "young woman" who is "bright, driven, dedicated and all around gem of a person." (ECF No. 100-1 at 37.) Roth wrote that "[Pakler's] family and mine have been dear friends forever and I have known her her entire life." (Id.)

Ross has referred people for employment who are "later on in life." (Dep. of Roth at 134 (ECF No. 100-1 at 12).) It would not be Roth's "style" to "pitch someone as this old lady or this old man." (Id.)

### B. Facial Retaliation Claim

### 1. UPMC's Welfare Benefits Plan

UPMC maintains an Employee Retirement Income Security Act ("ERISA") plan known as UPMC Welfare Benefits Plan, Plan No. 501 (the "UPMC Welfare Benefits Plan"). (Plaintiff's Joint Concise Statement of Facts ("P.J.C.S.F.") (ECF No. 116) ¶ 1.) The UPMC Welfare Benefits Plan applies to eligible staff members of thirty-one UPMC facilities, including UPMC Presbyterian-Shadyside. (P.J.C.S.F. (ECF No. 116) ¶ 2; Summary Plan Description for the UPMC Welfare Benefits Plan ("Summary Plan Description" (ECF No. 95-1) at 18.) The Summary Plan Description "serves as the official Plan document for the UPMC Welfare Benefits Plan." (Summary Plan Description (ECF No. 95-1) at 36.) The Summary Plan Description provides that if anything in the Summary Plan Description conflicts "with the official contracts or other legal document that govern each component of the Plan, the contracts and other legal documentation are followed to determine [an employee's] benefits." (Summary Plan Description (ECF No. 95-1) at 36.)  The Summary Plan Description provides that the UPMC Welfare Benefits Plan are "valuable programs" that are a part of an employee's "total compensation package…designed to attract and retain qualified staff members, as well as provide a certain level of personal security, convenience and assistance." (Id. at 15.)

Coverage for severance benefits at UPMC begins on an employee's first day of work. (P.J.C.S.F. (ECF No. 116) ¶ 5; Summary Plan Description (ECF No. 95-1) at 20.) UPMC self-insures the severance benefits it provides to its employees. (P.J.C.S.F. (ECF No. 116) ¶ 6; Summary Plan Description (ECF No. 95-1) at 17.) The UPMC Welfare Benefits Plan sets forth UPMC's "General Severance Policy" ("Severance Policy"). (P.J.C.S.F. (ECF No. 116) ¶ 8; Summary Plan Description (ECF No. 95-1) at 21-26.) The Severance Policy describes the conditions under which UPMC pays severance benefits to separated employees. (P.J.C.S.F. (ECF No. 116) ¶ 9; Summary Plan Description (ECF No. 95-1) at 21-26.) To be eligible for severance

benefits under the Severance Policy, employees must "sign and return a UPMC approved Separation Agreement and General Release." (P.J.C.S.F. (ECF No. 116) ¶ 10; Summary Plan Description (ECF No. 95-1) at 21, 23.) Employees who "refuse to or fail to sign and return a UPMC-approved Separation Agreement and General Release" are ineligible for severance benefits. (P.J.C.S.F. (ECF No. 116) ¶ 11; Summary Plan Description (ECF No. 95-1) at 22-23.)

Under the heading "Release Requirement," the Severance Policy provides:

> You will become eligible for severance payments only after you sign and deliver to your Human Resources Consultant, or his or her designee, a UPMC-approved (provided by and acceptable to UPMC) Separation Agreement and General Release to UPMC. You also must return the signed Separation Agreement and General Release within the time frame specified by UPMC. The Separation Agreement and General Release will include, among other items, a release of all employment-related and other claims that may, by law, be released.

(P.J.C.S.F. (ECF No. 116) ¶ 12; Summary Plan Description (ECF No. 95-1) at 23.) UPMC's regular practice is to require an executed separation agreement and general release before paying severance benefits under its Severance Policy. (P.J.C.S.F. (ECF No. 116) ¶ 13; Deposition of Kathryn Devine ("Devine Dep.") (ECF No. 95-2) at 214.)

## 2. UPMC provides Plaintiff with a Separation Agreement

On June 1, 2010, at plaintiff's termination meeting, Devine presented plaintiff with a Separation Agreement and General Release (the "Separation Agreement"). (P.J.C.S.F. (ECF No. 116) ¶ 15; Dep. of Devine at 205 (ECF No. 111-8 at 92).) The Separation Agreement identified plaintiff's severance benefit as $48,000.68. (P.J.C.S.F. (ECF No. 116) ¶ 69.) Devine instructed plaintiff to speak with her lawyer about the Separation Agreement. (Pl's. Dep. at 248 (ECF No. 101-1 at 62).) On July 1, 2010, plaintiff signed the Separation Agreement. (P.J.C.S.F. (ECF No. 116) ¶ 17.) Plaintiff read the Separation Agreement prior to signing it. (Pl.'s Dep. at 246 (ECF No. 101-1 at 62.) As a consequence of signing the Separation Agreement, plaintiff received

$48,000.68 in severance pay. (Pl.'s Dep. at 248 (ECF No. 101-1 at 62).) UPMC entered into the Separation Agreement with plaintiff "solely to protect against the expense and disruption of defending an administrative claim or lawsuit in connection with [plaintiff's] employment or the termination of [her] employment," and wanted plaintiff to understand that UPMC's purpose was to avoid plaintiff filing administrative claims with respect to her employment or termination from employment. (Id. ¶ 18, 21.) An "administrative claim" as provided for in plaintiff's Separation Agreement encompasses, among other things, a charge filed with the Equal Employment Opportunity Commission (the "EEOC"), a complaint filed with the Pennsylvania Human Relations Commission (the "PHRC"), the Pittsburgh Commission on Human Relations, or the Department of Labor. (P.J.C.S.F. (ECF No. 116) ¶ 20; Deposition of Defendants ("Defs.' Dep.") (ECF No. 95-4) at 34-35.) Possible expenses incurred in defending an administrative claim include expenses incurred in: preparing an answer; attending a fact-finding conference; responding to a request for information; and hiring outside counsel to represent UPMC. (Id. ¶ 23.)

### 3. Provisions of the Separation Agreement

### i. Paragraph 10

Paragraph 10(b) of the Separation Agreement provides that plaintiff:

> Agrees that [she] will not initiate, file, or permit to be initiated or filed in her name or on her behalf, any form of lawsuit or administrative claim against UPMC, based upon any act, omission or event which occurred on or before the date on which this Agreement is signed and becomes effective or in any way in connection with the terms and conditions of [her] employment or the termination of [her] employment[.]

(Separation Agreement (ECF No. 95-3) at 5.) Paragraph 10(c) of the Separation Agreement provides:

Agrees that this Release will survive the termination of this Agreement and, further, that her acceptance of any and all payments under the terms of this Agreement, will constitute a continuing ratification and reaffirmation of the terms of the foregoing release as applied to any and all possible claims based upon acts, events or failure to act before the acceptance of each such payment.

(Id.)
Paragraph 10(d) of the Separation Agreement provides:

Notwithstanding any other language which may be found elsewhere in this Agreement, this Agreement does not prohibit [plaintiff] from filing an administrative charge of discrimination under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act or the Equal Pay Act. [Plaintiff] does, however, freely and forever waive her right to monetary or other recovery should any federal, state or local agency pursue any such claims arising out of or relating to her employment with or separation from employment with UPMC.

(Id.) UPMC believed it had to include paragraph 10(d) in the Separation Agreement to comply with EEOC regulations. (P.J.C.S.F. (ECF No. 116) ¶ 48.)

Paragraph 10(f) of the Separation Agreement provides:

[Plaintiff] understands and agrees that if, after [plaintiff] signs this Agreement, it is determined by the United Stated [sic] Equal Employment Opportunity Commission, the Congress of the United States of America or the federal courts of relevant jurisdiction that the language contained in paragraph 10(d) is not required to be contained in separation agreements of this nature in order for such agreements to be enforceable, that the provisions of paragraph 10(d) shall be null and void and shall cease to have any meaning or effect.

(Separation Agreement (ECF No. 9503) at 6.)

Plaintiff is not a lawyer. (P.J.C.S.F. (ECF No. 116) ¶ 54.) Plaintiff understood some of the Separation Agreement when she signed it. (Plaintiff's Deposition at 246 (ECF No. 101-1 at 62).) Plaintiff spoke with her attorney about the parts of the Separation Agreement she did not understand. (Plaintiff's Deposition at 247-48 (ECF No. 101-1 at 62).) Plaintiff does not know:

- what EEOC or Congressional determinations are (Plaintiff's Affidavit (ECF No. 95-5) ¶¶ 9, 10);

- how to monitor determinations by the EEOC, Congress, or federal courts of relevant jurisdiction on whether the language contained in paragraph 10(d) of the Separation Agreement is required for the Separation Agreement to be enforceable (Id. ¶¶ 9, 10, 11); or

- which courts are "federal courts of relevant jurisdiction."

### ii. Paragraph 4

Paragraph 4 of the Separation Agreement provides that plaintiff "will not make any disparaging or negative material remarks (whether written or oral) regarding UPMC." (P.J.C.S.F. (ECF No. 116) ¶ 35.) Paragraph 4 prohibits plaintiff from making remarks that would tend to call into question, in a public way, UPMC's business practices or fairness as an employer. (Id. ¶ 36.) UPMC defines "material remarks" as "[r]emarks that would tend to call into question UPMC's business practices, patient care quality, or fairness as an employer in a public way," e.g., "[l]etters to the editor, standing on a soapbox in [a public forum] making a speech." (Malloy Dep. at 82-83 (ECF No. 95-4 at 21.)

### iii. Paragraph 8

Paragraph 8 of the Separation Agreement provides:

[Plaintiff] will not disclose the terms and facts of this Agreement to any person without the written consent of UPMC, except to [her] spouse and [her] legal, financial, and tax advisors, or as otherwise required by law or legal process. [Plaintiff] understands and agrees that noncompliance with the terms and conditions of this paragraph will be construed by UPMC to be a breach of contract and to entitle it to seek remedies including, but not limited to, money damages plus interest, immediate repayment of all payments received by [plaintiff] under the terms of this Agreement and payment of costs and attorney fees incurred by UPMC in seeking the assistance of the court in pursuit of those remedies.

(Separation Agreement (ECF No. 95-3) at 3.)

### 4. Plaintiff files a charge of discrimination with the EEOC

On August 2, 2010, plaintiff filed a charge of discrimination with the EEOC. (Compl. (ECF No. 1) ¶ 6; Ans. (ECF No. 10) ¶ 4.) Plaintiff was scared to file and apprehensive about filing a charge with the EEOC because she feared UPMC would sue her for breaching the Separation Agreement. (Pl.'s Aff. (ECF No. 95-5) ¶ 12.) On October 20, 2011, the EEOC issued a finding in plaintiff's favor. (ECF No. 1-3.)

On February 6, 2013, an attorney in the Pittsburgh, Pennsylvania area contacted plaintiff's counsel. (Pl.'s Aff. (ECF No. 95-5) ¶ 14.) Plaintiff understands that the attorney is representing a client who has an age discrimination case against UPMC in the Western District of Pennsylvania and wants to speak with plaintiff about his case. (Pl.'s Aff. (ECF No. 95-5) ¶ 14.) Plaintiff wishes to speak with the attorney and assist him with his age discrimination lawsuit, but will not speak with him because she fears UPMC will sue her for breach of the Separation Agreement for doing so. (Id. ¶ 15.) Plaintiff will not communicate with or assist the EEOC, the PHRC, or other attorneys investigating or pursuing ADEA claims against UPMC because she fears UPMC will deem such activity to be a breach of the Separation Agreement and will sue her in court. (Id. ¶ 16.)

### III. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether

the evidence of record is such that a reasonable jury *could* return a verdict for the nonmoving party. Id. at 249 (emphasis added). The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Se. Pa. Transp. Auth., 479 F. 3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

The Third Circuit Court of Appeals has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not of course defeat a motion for summary judgment but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F. 3d 2, 8 (1st Cir. 1993) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

## IV. Discussion

### A. Plaintiff's claim that she was fired because of her age

#### 1. Applicable Law

The ADEA prohibits an employer from discriminating against any employee on the basis of the employee's age if the employee is over forty years old, and the PHRA provides likewise.[3]

---

[3] Age discrimination claims under the PHRA are treated the same as ADEA claims and the PRHA and ADEA claims should be collectively treated. Colwell v. Rite Aid Corp., 603 F.3d 495, 500 n.3 (3d Cir. 2010).

29 U.S.C. §§ 623(a), 631(a); 43 Pa. Cons. Stat. §§ 954(h), 955(a). In <u>McDonnell Douglas Corp.</u> <u>v. Green</u>, 411 U.S. 792, 801 (1973), the Supreme Court recognized that it is often difficult to prove that an employer acted with conscious intent to discriminate. One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but was a pretext for unlawful discrimination. <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

In <u>McDonnell Douglas</u>, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The <u>McDonnell</u> <u>Douglas</u> framework requires a plaintiff to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." <u>Burdine</u>, 450 U.S. at 254. In so doing, "[t]he *prima facie* case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 728-29 (3d Cir. 1995) (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)).

The Third Circuit Court of Appeals has held that the burden-shifting framework set forth in <u>McDonnell Douglas</u> applies to claims of discrimination arising under the ADEA. <u>Smith v.</u> <u>Allentown</u>, 589 F.3d 684, 690 (3d Cir. 2009). In <u>Smith</u>, the court described the <u>McDonnell</u> <u>Douglas</u> framework as applied to claims arising under the ADEA as follows:

> Under <u>McDonnell Douglas</u>, the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. <u>Potence v. Hazleton Area Sch.</u> <u>Dist.</u>, 357 F.3d 366, 370 (3d Cir.2004). Once the plaintiff satisfies these elements,

the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action. <u>Keller</u>, 130 F.3d at 1108. If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination. <u>Starceski v. Westinghouse Elec. Corp.</u>, 54 F.3d 1089, 1095 n. 4 (3d Cir.1995). At all times, however, the burden of persuasion rests with the plaintiff. <u>Id.</u>

<u>Smith</u>, 589 F.3d at 689-90.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008). The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir.1994). The Supreme Court has instructed:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. <u>See</u> <u>Sweeney</u>, <u>supra</u>, at 25, 99 S.Ct., at 296. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

<u>Burdine</u>, 450 U.S. at 254-56. The nondiscriminatory reason proffered by the defendant must be "clear and reasonably specific." <u>Id.</u> at 258. "This obligation arises both from the necessity of

rebutting the inference of discrimination arising from the prima facie case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext." Id.

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework-with its presumptions and burdens'-disappear[s],…and the sole remaining issue [is] 'discrimination vel non.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (citations omitted). The plaintiff has the burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

The United States Court of Appeals for the Third Circuit has developed the following two-prong test (the "Fuentes test") that a plaintiff must meet to show pretext:

> [T]o defeat summary judgment when the [employer] [articulates] legitimate non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes, 32 F.3d at 764; see Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)."). The two prongs of the Fuentes test are distinct. The court, where appropriate, will analyze both prongs of the Fuentes test to determine whether sufficient evidence was presented by plaintiff to defeat defendants' motion for summary judgment.

### 2. Parties' Arguments

In the complaint, plaintiff alleges defendant fired her because of her age in violation of the ADEA. Defendants in their motion for summary judgment argue that even assuming plaintiff can establish the prima facie case for discrimination under the ADEA, it has set forth a non-discriminatory reason for firing plaintiff, and based upon the evidence of record, plaintiff cannot establish pretext. Defendants argue they fired plaintiff because she "made grievous and egregious errors in responding to a Pennsylvania Department of Health…investigation of a complaint pertaining to WPIC which placed UPMC Presbyterian Shadyside in danger of losing its Medicare funding, and…caused a loss in faith pertaining to Plaintiff's ability to lead the [HIM] [d]epartment." (ECF No. 102 at 4-5.)

Plaintiff in response to defendants' motion argues (1) "[d]efendants have not articulated a legally sufficient reason for [plaintiff's] termination;" and (2) "[a] reasonable fact finder could find [defendants'] explanation for discharging [plaintiff] is pretextual." (ECF No. 114 at 5-6.) The parties' arguments, applicable rules of law, and the evidence of record will be addressed below.

### 3. The Prima Facie Case

To establish the prima facie case under the ADEA, the plaintiff must show that:

(1) he or she is at least forty years old;

(2) the defendant took an adverse employment action against him or her;

(3) the plaintiff was qualified for the position in question; and

(4) the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.

Smith v. Allentown, 589 F.3d 684, 659 (3d Cir. 2009). Here, defendants for the purposes of their motion for summary judgment concede that based upon the evidence of record, plaintiff can

establish the prima facie case. (ECF No. 102 at 4) ("Defendants assume, *arguendo* and solely for the purposes of [their] motion for summary judgment, that Plaintiff can establish her *prima facie case* of age discrimination.") The court in this opinion will, therefore, assume that a reasonable jury could find that plaintiff proved the elements of a prima facie case, and will not address the prima facie case further in this opinion.

### 4. Nondiscriminatory Reason

Defendants' burden to identify a legitimate nondiscriminatory reason for the adverse employment action is "relatively light." Fuentes, 32 F.3d at 763. The Court in Burdine instructed that a defendant's proffered legitimate nondiscriminatory reason will be sufficient to satisfy defendant's burden at this stage if it serves to "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Burdine, 450 U.S. at 255. Defendants argue their nondiscriminatory reason for firing plaintiff is that she "made grievous and egregious errors in responding to a Pennsylvania Department of Health…investigation of a complaint pertaining to WPIC which placed UPMC Presbyterian Shadyside in danger of losing its Medicare funding, and…caused a loss in faith pertaining to Plaintiff's ability to lead the [HIM] [d]epartment." (ECF No. 102 at 4-5.) Plaintiff argues this reasoning is not legally sufficient under Burdine, because it does not clearly and specifically identify what plaintiff did wrong. (ECF No. 114 at 3-4.)

The evidence of record shows, however, that defendants' stated reasoning for firing plaintiff was that in her interview with Bachowski, she denied responsibility for DEC medical records. Roth testified that plaintiff was fired because "[w]hen asked if she was responsible for information, health information management in the DEC, she denied responsibility for oversight for ambulatory HIM." (Dep. of Roth at 192  (ECF No. 111-7 at 54).) Medved testified that

plaintiff was fired because plaintiff "indicated that she had no responsibility for the HIM function for the DEC; therefore, there's no oversight for the HIM function which is required by CMS and DOH." (Dep. of Medved at 219 (ECF No. 111-5 at 19).) Defendants' proffered legitimate nondiscriminatory reason clearly and specifically identifies what plaintiff did wrong, and gives plaintiff a full and fair opportunity to show pretext in this case; indeed, plaintiff spends more than fifteen pages of briefing describing how defendants' proffered reason for firing plaintiff is pretext for firing her based upon her age.

Plaintiff argues that defendants' proffered reason for her termination is not sufficient because Roth, Medved and Devine "cannot agree on what Ms. DeCecco told the DOH surveyor that supposedly resulted in her termination." (ECF No. 114 at 5.) Plaintiff asserts:

> Comparing Roth, Medved and Devine's testimony, Ms. DeCecco was fired because she supposedly denied HIM responsibility for (1) DEC records…**or** for (2) all ambulatory records…**or** for (3) all medical records and HIM functions at WPIC.

(ECF No. 114 at 5.) Plaintiff's argument in this regard, however, lacks merit. As defendants point out, it is undisputed that the DEC is an ambulatory program at WPIC. For defendants to testify that plaintiff was fired because she denied responsibility for ambulatory records or any medical records at WPIC is not inconsistent with testimony that plaintiff was fired for denying responsibility for the DEC medical records.

Plaintiff cites <u>Smith v. Davis</u>, 248 F.3d 249, 252 (3d Cir. 2001), and <u>Husick v. Allegheny County</u>, Civ. Action No. 07-1175, 2010 WL 1903748, at *10-11 (W.D. Pa. May 10, 2010), in support of her argument that defendants' proffered legitimate nondiscriminatory reason is not sufficient to satisfy their burden in this case. In <u>Smith</u>, the plaintiff was told he was fired for violating his employer's drug and alcohol policy. <u>Smith</u>, 248 F.3d at 252. The court noted, however, that there was no evidence of record "specifying precisely what aspect of this policy

[the plaintiff] was found to have violated." <u>Id.</u> The defendant-employer in its brief in support of its motion for summary judgment argued it fired plaintiff because of absenteeism, but the court noted that "the [plaintiff's] supervisors' declarations [did] not mention absenteeism, and the drug and alcohol policy [did not contain any] provision about absenteeism or sick leave that applie[d] to [the plaintiff's] termination." <u>Id.</u> Based upon those facts, the court concluded the defendant-employer was not entitled to summary judgment because, among other reasons, there was a genuine dispute of material fact with respect to whether the defendant-employer's proffered legitimate nondiscriminatory reason for firing the plaintiff "was legitimate or pretextual." <u>Id.</u> The court in <u>Smith</u> denied the defendant-employer's motion for summary judgment because the plaintiff pointed to evidence of record to create a genuine dispute of material fact with respect to whether the defendant-employer's legitimate nondiscriminatory reason was pretext for discrimination. The decision in <u>Smith</u> cannot support plaintiff's argument because it concerned whether the plaintiff pointed to sufficient evidence to create a genuine dispute of fact with respect to the defendants' legitimate nondiscriminatory reason being pretext, and not whether defendants' legitimate nondiscriminatory reason was sufficient in the first instance.

In <u>Husick</u>, the only evidence the defendant-employer presented in support of its decision to fire the plaintiff was a letter that read, in pertinent part, as follows:

> It has been brought to my attention that you have misrepresented information to a Criminal Division Judge to whom you were assigned, to court personnel, the Sheriff's Department and members of the public. In a separate matter, [sic] potentially compromised the safety of this Judicial Officer by not following established security precautions regarding a defendant. These actions are inappropriate for a Senior Minute Clerk and undermine the integrity of the court system and the safety of our staff and the public.

> Based upon these latest incidents, and our previous discussions regarding your work performance, the Court has decided to terminate your employment effective today.

Id. at *10-11. The plaintiff "was unable to recall the specific incidents referenced in [the] letter," and counsel for the defendant-employer was "unable to 'address the specifics' of the termination decision," "referr[ing] only to 'general conversations' with [the defendant-employer's] personnel concerning 'serious problems' with the 'job performance' and 'conduct' of [the defendant]." Id. at *11. The court determined that the evidence presented, i.e., the letter, was insufficient to satisfy the defendant-employer's burden of production to identify a legitimate nondiscriminatory reason for firing the plaintiff because, among other things, the proffered reason was "too general to give [the plaintiff] 'a full and fair opportunity to demonstrate pretext.'" Id. (quoting Burdine, 450 U.S. at 256). In contrast to the defendant-employer in Husick that relied upon general references to misconduct in a letter to identify its legitimate nondiscriminatory reason, defendants in this case specifically point to plaintiff's alleged denial of responsibility for the DEC medical records as the legitimate nondiscriminatory reason for firing plaintiff. While the plaintiff in Husick could not recall the misconduct the defendant-employer referred to in the letter, here, plaintiff knows exactly what interview defendants are referring to and offered evidence to rebut defendants' version of events with respect to that meeting. In other words, unlike the plaintiff in Husick, plaintiff in this case is fully capable of presenting evidence to demonstrate defendants' proffered reason for firing her is pretext for discrimination.

Defendants met their burden to "intoduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763. Defendants' proffered legitimate nondiscriminatory reason for firing plaintiff is sufficiently clear and specific to shift the burden to plaintiff to prove pretext. Whether there is sufficient evidence of record in this case to show the legitimate

nondiscriminatory reason is pretext for discrimination, as was the case in <u>Smith</u>, will be discussed below.

### 5. Pretext

The court concludes defendants satisfied their burden to set forth a legitimate nondiscriminatory reason for terminating plaintiff's employment. In turn, plaintiff must carry the burden of proving by a preponderance of the evidence that the legitimate reason offered by defendants was not their true reason, but was a pretext for discrimination. <u>Jones</u>, 198 F.3d at 410. The court will determine whether plaintiff met this burden to show a reasonable jury could find based upon the evidence of record that defendants' proffered legitimate nondiscriminatory reason for firing plaintiff was pretext for discrimination under the two-prong test set forth by the Third Circuit Court of Appeals in <u>Fuentes</u>.

### i. Prong one of <u>Fuentes</u> test

Prong one of the <u>Fuentes</u> test focuses on whether a plaintiff submitted evidence from which a fact-finder could reasonably disbelieve a defendant's articulated legitimate reasons for the plaintiff's termination. Under this prong, the plaintiff must point to

> such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," <u>Ezold</u>, 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

<u>Fuentes</u>, 32 F.3d at 765. The district court under this prong must focus on the legitimate, non-discriminatory reason offered by the employer. <u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 531 (3d Cir. 1992) (A "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon . . . ."). The court is neither permitted to get involved in

the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Id. at 527.

The question in prong one of the Fuentes test "'is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)). Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it. Wildi v. Alle-Kiski Medical Center, 659 F.Supp.2d 640, 670 (W.D. Pa. 2009).

> It is not the function of this court to determine whether defendants' business judgment in terminating plaintiff was correct. In Watson v. Southeastern Pennsylvania Transportation Authority, 207 F.3d 207 (3d Cir.2000), the Court of Appeals for the Third Circuit explained that an employer is permitted "to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct." Id. at 222.
> …
> The inquiry must focus upon "the perception of the decision maker." Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir.1991). The defendants only needed an honest belief that the incidents occurred. Watson, 207 F.3d at 222.

Id. Here, plaintiff disputes that she denied responsibility for the DEC medical records in the February 23, 2010 interview with Bachowski, and asserts her response to Bachowski's questioning did not cause the condition-level deficiencies or subsequent investigation at UPMC Presbyterian Shadyside. Whether defendants were correct about what plaintiff told Bachowski and the impact of her statement is not determinative; rather, the inquiry must focus upon whether defendants' view of what took place during plaintiff's interview with Bachowski and their opinions about the impact of her responses support the reason plaintiff was terminated or whether the *actual reason* she was terminated was her age.

In her submissions in response to defendants' motion for summary judgment, plaintiff attempts to show defendants' proffered legitimate nondiscriminatory reason for firing her is pretext for firing her based upon her age. Plaintiff makes various arguments and points to evidence of record to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendants' legitimate reasons for terminating her to support her argument that a reasonable jury could find defendant did not fire her because of her performance in the February 23, 2010 interview, and, therefore, defendants are not entitled to summary judgment in this case. Fuentes, 32 F.3d at 765. Each of plaintiff's arguments and defendants' responses with respect to pretext will be addressed below.

### a. Final Decision Maker

Plaintiff argues that "an employer's effort to hide the real decisionmaker precludes summary judgment," and a reasonable jury could find that defendants hid the real decision maker in this case. (ECF No. 114 at 6.) Plaintiff cites Reeves, 530 U.S. at 151-52, Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000), and Sabbreses v. Lowes Home Center, 320 F.Supp.2d 311, 326 (W.D. Pa. 2004), in support of this argument.

In Reeves, the petitioner sued the defendant-employer for firing him based upon his age. Reeves, 530 U.S. at 138. The petitioner introduced evidence that a director in the defendant-employer's company, who, according to the petitioner, made numerous age-biased comments about the petitioner, "was the actual decisionmaker behind [the petitioner's] firing." Reeves, 530 U.S. at 151-52. Other evidence of record indicated that the defendant-employer's president, i.e., the director's wife, made the formal decision to discharge the petitioner. Id. at 152. The Court determined that, along with other evidence introduced by the plaintiff, the evidence that the

actual decision maker was the director who made age-biased comments supported a jury finding that the respondent intentionally discriminated against the petitioner. Id. at 154.

In Farrell, the plaintiff sued the employer-defendant for retaliation and quid pro quo sexual harassment under Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e, et seq. Farrell, 206 F.3d at 274. According to the plaintiff, the defendant-employer fired her after she rejected sexual advances from one of the defendant-employer's directors. Id. at 278. The defendant-employer asserted the plaintiff was fired because "upper management" made the decision to consolidate her position with another position. Id. at 277. The plaintiff introduced evidence, however, that the decision to fire her was made solely by the director who made the sexual advances toward her. Id. The court relied upon this evidence, in part, to conclude the evidence of record was sufficient for plaintiff to "show the causation required for a prima facie case of retaliation and quid pro quo harassment." Id. at 286.

In Sabrese, the plaintiff sued his former employer for terminating his employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq., the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq., and the Pennsylvania Human Relations Act, 42 PA. CONS. STAT. § 951, et. seq. The court—in deciding the parties' cross-motions for summary judgment—applied the McDonnell Douglas framework to plaintiff's claims. The defendant-employer's proffered legitimate nondiscriminatory reason for firing the plaintiff was that the plaintiff pushed a co-worker in violation of company policy. Id. at 325. The court determined the evidence presented by the plaintiff showed "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in the defendant's proffered legitimate nondiscriminatory reason for firing him, which created a genuine dispute of material fact with respect to whether the proffered reason was the *actual* reason the defendant fired him. Id. at 326. The evidence

relied upon by the court included evidence that none of the defendant-employer's employees acknowledged that they made the ultimate decision to fire the plaintiff. Id.

Here, defendants identified Roth, Medved, and Devine as the final decisionmakers with respect to the decision to fire plaintiff in the following documents: (1) defendants' position statement to the EEOC; (2) an additional letter defendants submitted to the EEOC; and (3) defendants' response to plaintiff's interrogatories. Medved testified that she was "one of a couple of people" along with Roth and Devine that made the decision to terminate plaintiff's employment with UPMC. (Dep. of Medved at 190 (ECF No. 111-5 at 18.) Medved testified that Roth first said they needed to discuss whether plaintiff should be fired, but that all three of them—Roth, Devine, and Medved—came to an agreement that plaintiff should be fired. (Dep. of Medved at 322-32 (ECF No. 111-5 at 43).) According to Devine, Roth, Medved, and she made the decision to terminate plaintiff's employment. (Dep. of Devine at 191 (ECF No. 111-8 at 83).) Based upon this evidence, defendants clearly identified Roth, Medved, and Devine as the final decisionmakers in this case.

As pointed out by plaintiff, however, Roth testified that she made the decision to terminate plaintiff by herself, and spoke with Medved, Devine, and Concordia about the decision. This evidence, by itself, is not sufficient to preclude summary judgment in favor of defendants because it does not show weaknesses or implausibilities in defendants' proffered legitimate nondiscriminatory reason for firing plaintiff. Unlike the decisions cited by plaintiff, the facts of this case do not show that defendants hid the identity of the final decisionmaker in a way that is probative of pretext. In Reeves, the defendant-employer concealed that the decisionmaker was the same person who made various age-biased comments about the plaintiff. In Farrell, the plaintiff accused the defendant-employer of concealing that the final

decisionmaker was the director who made sexual advances toward her, and in <u>Sabrese</u>, the defendant-employer failed to identify *any* decisionmakers. These decisions are clearly distinguishable from the facts of this case. Although plaintiff accuses Roth of making age-biased comments, Roth, unlike the director in <u>Reeves</u>, took full responsibility for the decision to fire plaintiff. In contrast to the defendant-employer in <u>Farrell</u>, defendants in this case did not attempt to conceal a decisionmaker who engaged in misconduct towards the plaintiff, and unlike the defendant-employer in <u>Sabrese</u> that did not identify *any* decisionmakers, defendants in this case identified *three* final decisionmakers that were all in agreement that plaintiff must be fired.

Plaintiff argues Roth also testified "that she and Concordia were concurrent final decisionmakers." (ECF No. 114 at 6.) Plaintiff's argument mischaracterizes Roth's testimony. Roth testified that she spoke with Concordia, her boss, about her decision to fire plaintiff, and that Concordia concurred with her decision. When plaintiff's counsel asked Roth if her decision to terminate plaintiff was made for her by Concordia, Roth testified that she did "not recall it that way." (Roth Dep. 235 (ECF No. 111-7 at 75.) Plaintiff's counsel pressed the issue further, and the following exchange took place:

> Q. [ ] And if you had said [to Concordia], let's say you had been of the view it's fixable, it's no problem, miscommunication, Kim Owens told me that she didn't really think Diane understood the question, the surveyor was not quoting and there are things dot dot dot that were left out, important things contextually, I think that Diane can continue in her role as the HIM director and Liz Concordia had responded to you by saying no, I have lost confidence, is Diane Dececco's [sic] fate essentially sealed in that situation?
>
> A. I don't know.
>                                        …
> Q. Well, if you heard your boss say that, what would you do?
>
> A. We have a relationship that we – we have a very open communication style between us and we put everything on the table and actually it's a culture where subordinates are respected by pushing back if they feel strongly about something and that is the relationship I have with Liz.

(Roth Dep. 235 (ECF No. 111-7 at 75.) This evidence does not support plaintiff's argument that Concordia made the decision to terminate plaintiff. Roth consulted Concordia, who concurred with her position, but Roth's testimony does not support a reasonable jury finding that Concordia was a decisionmaker with respect to the decision to fire plaintiff.

Plaintiff also argues that although Devine testified that Roth, Medved, and she made the decision to terminate plaintiff, she later "reversed herself and testified that she was not a decisionmaker at all because she relied exclusively on Roth and Medved's assessments of Plaintiff's performance." (ECF No. 114 at 6.) Plaintiff mischaracterizes Devine's testimony. Devine never testified that she did not make the decision to fire plaintiff. Devine testified that in making that decision, she relied upon Roth's and Medved's views about plaintiff's performance during the Februrary 23, 2010 interview with Bachowski because Roth and Medved were "subject matter experts" with respect to the issues raised by that interview and Devine would not understand whether plaintiff's answers were right or wrong. (Dep. of Devine at 155 (ECF No. 111-8 at 50).) Devine's reliance on Roth's and Medved's views about plaintiff's performance during the February 23, 2010 interview, does not mean that Devine did not take part in making the decision to fire plaintiff.

Based upon the foregoing, plaintiff's argument with respect to defendants hiding the final decisionmakers will not—by itself—preclude the entry of summary judgment in favor of defendants.

### b. Plaintiff's interview with Bachowski

Plaintiff argues that based upon her submissions and the evidence of record, she contradicted the "core facts" of defendants' legitimate nondiscriminatory reason for firing her, and defendants' motion for summary judgment should be denied on that basis. (ECF No. 114 at

8-11.) In <u>Tomasso v. The Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006), the Third Circuit Court of Appeals recognized that a plaintiff "must do more than show that [his or her employer] was 'wrong or mistaken' in deciding to lay him [or her] off." A plaintiff "must 'present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision.'" <u>Id.</u> The evidence put forth by the plaintiff must contradict the core facts forming the basis of the defendant's reasoning in such a way as to show defendants could not have possibly believed them. <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1110 (3d Cir. 1997) ("But the relevant question is not whether Keller could have done better; instead, the relevant question is whether the evidence shows that it was so clear that Keller could not have done better that ORIX Credit Alliance could not have believed otherwise."). Under those circumstances, a plaintiff may satisfy his or her burden to prove that defendants' proffered legitimate nondiscriminatory reason for firing him or her is pretext for age discrimination.

If a plaintiff makes that showing in defending against a defendant's motion for summary judgment, i.e., the plaintiff shows that based upon the evidence of record a reasonable jury could find the defendant's proffered legitimate nondiscriminatory reason is pretext for discrimination, the court must deny the defendant's motion for summary judgment. Plaintiff attempts to make that showing in this case by contradicting the core facts defendants relied upon to fire her.

In making their decision to fire plaintiff, defendants relied upon Bachowski's account of what took place during his February 23, 2010 interview with plaintiff. In Bachowski's report following his interview with plaintiff, he wrote that she responded to his questioning as follows:

> "We don't do any record analysis for ambulatory programs … The DEC is an ambulatory program … We only do it [record analysis] for inpatient records … We just accept what they [DEC staff] send to us … The record review of the DEC would be the responsibility of the DEC … We are the custodian of the documents, we store everything. We aren't responsible for the DEC."

(Bachowski's Report dated 2/23/2010 at 6 (ECF No. 101-2 at 48).) Plaintiff admits she made the statements Bachowski included in his report, but argues Bachowski did not include the entirety of her statements, and "the gaps in what [she] said distorts the meaning." (Pl.'s Dep. at 204 (ECF No. 111-3 at 15).) Plaintiff testified that she described the HIM department's oversight of the DEC medical records in accordance with WPIC's procedures to Bachowski, and did not tell him that she was not responsible for the DEC medical records; instead, she explained to him that "[she] wasn't responsible for reviewing or analyzing the DEC records, that the program was responsible." (Pl.'s Dep. at 189 (ECF No. 111-3 at 9).) Plaintiff described what she told Bachowski as follows:

> So I just continued to explain the procedure. I told him that the ambulatory programs regularly reviewed records and turned the results of those records in, and that's how we monitored the completion of ambulatory records through those reviews.
>
> Jenn Schneeman was there and confirmed that was the process.

(Pl.'s Dep. at 187-88 (ECF No. 111-3 at 7-8).) Plaintiff did not feel as if Bachowski listened to her when she described the ambulatory review process set in place at WPIC. (Pl.'s Dep. at 191 (ECF No. 111-3 at 11).)

According to plaintiff, a reasonable jury could conclude based upon her version of the February 23, 2010 interview with Bachowski that she

> truthfully, accurately and repeatedly explained to Bachowski both the HIM Department's oversight mechanisms for ambulatory records (including DEC records) both through the program audits at the point of care and the reporting process up the chain, and through the monitoring features in the PsychConsult software, and further explained that there were different records review processes for inpatient and ambulatory records at WPIC.

(ECF No. 114 at 10.) The testimony presented by plaintiff creates a genuine dispute of fact with respect to what she told Bachowski during the Feburary 23, 2010 interview. A genuine dispute of

fact with respect to what plaintiff told Bachowski during that interview, however, is not a sufficient basis for a reasonable jury to find that defendants' proffered legitimate nondiscriminatory reason for firing plaintiff is pretext for age discrimination. Whether defendants made the "wrong or mistaken" choice to believe Bachowski over plaintiff does not satisfy plaintiff's burden to prove pretext. Unlike in Tomasso, where it was the plaintiff's word against the employer's word, here, it is plaintiff's word against the word of a third party, i.e., Bachowski, who drafted a report to his employer that detailed what plaintiff allegedly said during the February 23, 2010, interview. Under those circumstances, plaintiff did not contradict the core facts in such a way as to show that defendants could not possibly have believed them when they made the decision to fire her.

There is evidence of record, however, to show that there is a genuine dispute of material fact with respect to whether defendants *actually* believed plaintiff's version of events with respect to the February 23, 2010 interview and whether defendants *actually* thought plaintiff's performance as recounted by Bachowski warranted her termination. Under either of those circumstances, the dispute of fact with respect to what plaintiff told Bachowski during the interview is *material* and precludes the entry of summary judgment in favor of defendants in this case.

With respect to evidence that defendants actually believed plaintiff's version of events, plaintiff points to an email written by Medved to Roth and Owens after Medved met with plaintiff and learned about plaintiff's version of events with respect to the February 23, 2010 interview. In the email, Medved wrote:

> Met with Diane—I think I get it more now. Some semantics, some miscalculating words, some of the "…" in the report of deficiencies were important contextual things left out. Have a phone call with Loren at 4:30 (unrelated of course) but would like to discuss when possible. Not sure it changes anything.

(reminder—I am out tomorrow—available if you need me )

(ECF No. 111-5 at 109.) Plaintiff argues this email is evidence that Medved believed plaintiff's account of what she told Bachowski about the DEC medical records during the February 23, 2010 interview. Defendant argues the email is evidence that Medved understood plaintiff's perspective about what occurred and not that she believed plaintiff's account of the February 23, 2010 interview. Plaintiff's counsel questioned Medved with respect to this email during her deposition, and the following exchange took place:

Q. […] So you understood it better after you talked to Diane according to this. Right?

A. I understood Diane's perspective.

Q. Oh. Well, what was her perspective?

A. I don't know. I can't remember.

Q. But this is an E-mail that you wrote. Correct?

A. Yes. I couldn't frankly understand why Diane performed how she did.

Q. Seems totally out of character, doesn't it?

A. It was a terrible performance.

Q. Totally out of character.

A. It was out of character for Diane. Yes.

(Dep. of Medved at 249-50 (ECF No. 111-5 at 26.) Defendants argue that based upon Medved's testimony along with the text of the email she sent to Roth and Owens, a reasonable jury could not conclude that Medved believed plaintiff's version of events with respect to the February 23, 2010 interview. A reasonable jury could find, however, that based upon the text of the email Medved sent to Roth and Owens, Medved accepted and believed plaintiff's account of the February 23, 2010 interview with Bachowski. Medved wrote: "Met with Diane—I think I get it

more now. Some semantics, some miscalculating words, some of the "…" in the report of deficiencies were important contextual things left out." (ECF No. 111-5 at 109.) A reasonable jury could find that Medved in the email was explaining to Roth and Owens what plaintiff told her *or* that Medved believed Bachowski "miscalculated" and left out plaintiff's words. Although Medved testified that she believed plaintiff's performance was terrible, a reasonable jury could discredit that testimony and find that based upon the text of the email she wrote to Roth and Owens, Medved understood *and* believed that plaintiff fully explained the ambulatory record review process to Bachowski and communicated that belief to Roth and Owens. To the extent the evidence shows Medved, a final decisionmaker, believed plaintiff did not perform poorly as Bachowski indicated, yet made the decision to fire plaintiff anyway, a reasonable jury could find defendants' proffered legitimate nondiscriminatory reason for firing plaintiff was pretextual.

With respect to whether defendants honestly believed that plaintiff's performance according to Bachowski warranted her termination, plaintiff explains that the evidence of record shows that in all the years she was employed by UPMC, she received favorable performance evaluations and accolades, with the most recent favorable performance evaluation conducted after the February 23, 2010 interview and a little over one month before she was fired. Plaintiff argues that evidence shows defendants did not think her performance during the February 23, 2010 interview warranted her termination.

With respect to plaintiff's past performance, the undisputed evidence of record shows:

- In the forty-one years plaintiff worked for WPIC, she was never disciplined for poor performance or placed on a performance improvement plan. (D.J.C.S.F. (ECF No. 125) ¶ 125.)

- Plaintiff "knew her job responsibilities very well, knew the organization very well, was extremely dedicated, competent[, and] a pleasure to work with." (Id. (Dep. of Roth at 174-75 (ECF No. 111-7 at 37).)

- In 2008, plaintiff—at the age of 58—received UPMC's Award for Commitment to Excellence and Service ("ACES"), which is given to one percent of UPMC's workforce in recognition of highly distinguished performance. (D.J.C.S.F. (ECF No. 125) ¶ 133.)

- Plaintiff had a distinguished career with and greatly contributed to WPIC. (Id. ¶ 126.)

- Each year of plaintiff's forty-one years of employment with UPMC, plaintiff was rated between "consistently meets expectations" and "consistently exceeds expectations." (ECF No. 111-11 at 2.)

With respect to plaintiff's performance evaluation, the undisputed evidence of record shows:

- Plaintiff's overall rating on the performance evaluation dated March 1, 2010, was 2.12. (Id. at 117.)

- An overall rating of 2.12 qualified plaintiff for a 1.50-2.50 percent merit raise and indicated plaintiff was a "Solid/Strong/Good Performer." (ECF No. 111-5 at 133.)

- Plaintiff was rated a "2" for, among other things, accountability, judgment/decision-making, and communications.

- In the "Development Plan" portion of the performance evaluation, Medved wrote, among other things: "We are confident that Diane possesses the skill and talents to take the HIM Department to the next level."

- The performance plan included a list of six goals for plaintiff to achieve in 2011, which was the upcoming work year.

Plaintiff argues that based upon her past performance and the performance review dated April 30, 2010, a reasonable jury could find that defendants did not honestly believe plaintiff's performance during the February 23, 2010 interview with Bachowski warranted her termination, and, therefore, the proffered legitimate nondiscriminatory reason for firing plaintiff is pretext for age discrimination. The court agrees with plaintiff.

Defendants assert that plaintiff was fired because she negated responsibility for the DEC medical records during her interview with Bachowski, which resulted in a loss of confidence in

plaintiff's ability to lead the HIM department. This evidence, however, is contradicted by plaintiff's performance evaluation conducted by Medved and shared with Roth and Devine. In the performance evaluation, Medved included plaintiff's goals for the upcoming work year; rated her as someone who consistently meets expectations; expressed that defendants were confident that plaintiff "possess[ed] the skill and talents to take the HIM Department to the next level;" and awarded plaintiff a merit raise due to her 2.12 rating. This evidence directly contradicts defendants' reasoning that plaintiff's performance during her interview with Bachowski was "so egregious" that it warranted her termination and a loss of confidence in her ability to perform as the director of the HIM department. Defendants argue that according to Medved's testimony, a score of 2.12 is not an excellent score for someone in plaintiff's position. A reasonable jury, however, may discount Medved's testimony in light of the evidence that a 2.12 means plaintiff consistently met expectations and entitled her to a merit raise. Based upon plaintiff's past performance for WPIC and her latest performance evaluation, which was conducted after her interview with Bachowski and prior to plaintiff's termination in June 2010, the evidence of record is sufficient for a reasonable jury to find pretext. In other words, the evidence of record establishes a genuine dispute of material fact with respect to whether plaintiff was fired because of her performance during the February 23, 2010 interview with Bachowski or because of her age.

Plaintiff pointed to evidence of record to create a genuine dispute of material fact with respect to whether Medved believed her account about what took place during the February 23, 2010 interview with Bachowski and whether defendants actually believed her performance during that interview, even as recounted by Bachowski, warranted her termination. Under those circumstances, plaintiff met her burden to adduce sufficient evidence to show defendants'

proffered legitimate nondiscriminatory reason for firing her is pretext for age discrimination. Defendants' motion for summary judgment will be denied on that basis.

### c. Plaintiff's performance did not cause the condition level deficiencies cited by CMS

Plaintiff attempts to prove pretext by pointing to evidence of record to contradict defendants' reliance on her performance causing the condition level deficiencies cited by the CMS to fire her. Plaintiff argues a reasonable jury could find that "DEC personnel and practices <u>not</u> involving the HIM Department, which DOH observed on February 17-18 (before Plaintiff was interviewed on the 23rd), were the sole cause of the single condition-level deficiency following the February 2010 complaint investigation." (ECF No. 114 at 10.) In other words, plaintiff argues the evidence of record shows her performance during the February 23, 2010 interview did not cause Bachowski to recommend condition-level deficiencies to the CMS. Defendants allege based upon Bachowski's testimony that plaintiff negating responsibility for the DEC medical records was a "significant" reason that condition-level deficiencies were found at WPIC and that plaintiff was fired because "she made egregious errors which led to condition-level violations." (J.C.S.F. ¶¶ 68, 85 (ECF No. 125 at 28, 41.)

Bachowski gave conflicting testimony with respect to the significance of plaintiff's alleged comment that she was not responsible for the DEC medical records. Bachowski testified to the following:

- Plaintiff's comment that she was not responsible for the DEC medical records was a significant part of why a condition-level deficiency was found;

- Plaintiff negating responsibility for the DEC medical records, by itself, would have led to further investigation at WPIC;

- Bachowski would have recommended a condition-level deficiency even if plaintiff did not make that comment; and

- There is nothing plaintiff could have told Bachowski on February 23, 2010, "to stop the recommendation for condition-level violation."

(Bachowski Dep. at 133-34, 177, 209-11 (ECF No. 100-3 at 44-46; ECF No. 111-4 at 66-67, 105.) In light of this conflicting testimony, there is a dispute of fact with respect to the significance of plaintiff's comments during her interview with Bachowski on February 23, 2010, i.e., whether plaintiff's comments caused the condition-level deficiency at WPIC. As discussed above, an employer's mistaken or wrong belief is not a ground to deny summary judgment in favor of the employer, and, therefore, if defendants were wrong about plaintiff causing the condition-level deficiency, that—in and of itself—is not a ground to deny defendants' motion for summary judgment. Whether the dispute of fact with respect to the significance of plaintiff negating responsibility for the DEC medical records is material depends upon whether there is evidence of record for a reasonable jury to find that defendants knew plaintiff's February 23, 2010 interview with Bachowski was not a cause of the condition-level deficiencies and blamed her for that result anyway. Under those circumstances, there would be evidence of record to show defendants' reasoning for firing plaintiff is pretext for discrimination.

Plaintiff argues that "Roth understood that the sole cause of the condition-level deficiency following the February 17-18, 23, 2010 DOH investigation was deficient administrative and clinical practice in the DEC." (J.C.S.F. ¶ 85(c) (ECF No. 125 at 42-43.) If plaintiff is correct that Roth knew the condition-level deficiency was based "solely" upon the internal workings of the DEC, then Roth would know plaintiff negating responsibility for the DEC was not a cause of the condition-level deficiency. Plaintiff cites to the following exchange between plaintiff's counsel and Roth from Roth's deposition in support of her argument that Roth knew plaintiff was not the cause of the condition-level deficiency at WPIC:

Q. What were the violations with respect to the DEC's medical records?

A. I can't cite them for you specifically, but they all pertain –

Q. General understanding, in other words, what were the problems that the surveyor found in DEC?

A. Maintenance of records. I can't be more specific. Health information management of the records in the DEC.

Q. Incomplete records; right?

A. In some cases, yes.

Q. Records that weren't timed?

A. Correct.

Q. Records that were being stored on site, so to speak, as opposed to being delivered to HIM; correct?

A. Correct.

Q. All sorts of problems with the records that were being generated in the DEC; correct?

A. Correct.

Q. And we talked earlier about the people that were generating the records; right?

A. Yes.

Q. And those are the people that you testified earlier had the responsibility for generating correct records; correct?

A. Yes.

Q. Incomplete records; right?

A. Yes.

Q. And records that complied with regulatory standards; correct?

A. Correct.

Q. They weren't doing that, were they, Dr. Roth?

A. Based upon the findings of the report, one would say no.

Q. Well, I mean you certainly – this was an egregious, you know, I don't know what language to use, but you called it egregious, this is something that could have jeopardized all of UPMC you testified. So I assume, and this is all occurring in your house, right, this is the DEC in Western Psych; right?

...

Q. Yes?

A. Yes.

(Roth's Dep. at 201-03 (ECF No. 111-7 at 60-62.) This testimony, if believed by a jury, demonstrates Roth's knowledge about the condition-level deficiencies with respect to the DEC's medical records. A reasonable jury could find based upon this evidence that Roth knew the condition-level deficiency with respect to the DEC medical records was based upon violations of protocol that occurred *within* the DEC and did not encompass plaintiff negating responsibilities with respect to those medical records.[4] Under those circumstances, that evidence along with defendants' argument that plaintiff caused the condition-level deficiency with respect to the DEC medical records is probative of pretext and may show that despite what plaintiff may have told Bachowski during the February 23, 2010 interview, defendants did not honestly believe that performance warranted plaintiff's termination.

### d. Plaintiff's performance did not cause the EMTALA investigation

Plaintiff attempts to prove pretext by pointing to evidence of record to contradict defendants' reliance on her performance causing EMTALA investigation as a reason to fire her.

---

[4] On the other hand, a reasonable jury could also find that Roth's testimony demonstrates that plaintiff's lack of management over the DEC medical records was a cause of the condition-level deficiency. Roth testified that Bachowski identified the "[m]aintenance of records" and "[h]ealth information management of the records in the DEC" as problems with respect to the DEC medical records. A reasonable jury could find this testimony demonstrates Roth knew plaintiff negating responsibility for the DEC medical records was part of the condition-level deficiency found by the CMS. (Roth's Dep. at 201-03 (ECF No. 111-7 at 60-62.)

Roth testified that "[Plaintiff's comments to Bachowski] led to a further – had Diane not negated her responsibility for the management of health information in the emergency department, in the DEC, the ensuing investigation would not have commenced." (Dep. of Roth at 192 (ECF No. 111-7 at 54).) Plaintiff argues, however, that a reasonable jury could find based upon the evidence of record "that the EMTALA investigation at the DEC was triggered days before Ms. DeCecco was interviewed on February 23, 2010…and that the EMTALA deficiencies were caused solely by DEC personnel and DEC clinical practices not involving Ms. DeCecco." (ECF No. 114 at 10.) Plaintiff also argues that a reasonable jury could find based upon the evidence of record that "Presbyterian-Shadyside flunked its recertification survey for reasons that had nothing to do with Ms. DeCecco at all." (Id. at 10-11.)

With respect to whether plaintiff caused the EMTALA investigation, the undisputed evidence of record shows:

- February 17 and 18, 2010, were the first two days of the DOH investigation;

- February 23, 2010, was the third and last day of the DOH investigation;

- Plaintiff was interviewed by Bachowski as part of the DOH investigation on February 23, 2010, at 2:40 p.m.;

- Bachowski was required to receive permission from the CMS to do an EMTALA investigation;

- February 23, 2010, was the first day of the EMTALA investigation.

- Bachowski did not interview plaintiff as part of the EMTALA investigation.

Based upon this evidence, and drawing all reasonable inferences in favor of plaintiff, a reasonable jury could find Bachowski requested permission from the CMS to conduct the EMTALA investigation prior to Bachowski's interview with plaintiff on February 23, 2010;

indeed, on March 3, 2010, Owens sent an email to Innocenti and Roth, among others, indicating that "On Tuesday, Feb 23, the DOH arrived to do an unannounced EMTALA investigation, based on their findings from the previous week." (ECF No. 111-6 at 1114.) Under those circumstances, a reasonable jury could conclude plaintiff did not *cause* the EMTALA investigation because Bachowski sought permission to conduct the EMTALA investigation before he spoke to plaintiff. As discussed above, Roth's mistaken or wrong belief that plaintiff caused the EMTALA investigation is not sufficient to preclude summary judgment in favor of defendants. Owens, however, sent the email to Roth explaining the EMTALA investigation was a result of Bachowski's findings the week before he interviewed plaintiff, and Roth was president of WPIC, a final decision maker in this case, and privy to the results of the DOH and EMTALA investigations. Roth blaming plaintiff for causing the EMTALA investigation in light of contradicting evidence that plaintiff did not cause the EMTALA investigation shows weaknesses or implausibilities in Roth's reasoning that is probative of pretext in this case and may show that despite what plaintiff may have told Bachowski during the February 23, 2010 interview, defendants did not honestly believe that performance warranted plaintiff's termination. Under those circumstances, and in light of the other evidence set forth by plaintiff, defendants' motion for summary judgment will be denied.

e. **Devine did not investigate Roth's and Medved's performance criticisms or termination decision**

Plaintiff argues Devine's lack of an investigation into Roth's and Medved's criticisms of plaintiff is evidence of pretext in this case. It is undisputed that Devine spoke with Roth, the president of WPIC, and Medved, plaintiff's direct supervisor, prior to making the decision with them to terminate plaintiff's employment. Plaintiff argues that a reasonable jury could conclude that Devine did not conduct an investigation "because she knew that the decisionmakers were not

honestly motivated by concerns about Ms. DeCecco's performance." (ECF No. 114 at 17.) Defendants argue that the "lack of investigation" does not create an issue of fact with respect to pretext. (ECF No. 121 at 10) (citing Geddis v. Univ. of Delaware, 40 F. App'x 650, 653 (3d Cir. 2002); Epps v. First Energy Nuclear Operating Co., Civ. Action No. 11-1462, 2013 WL 1216858, at *29 (W.D. Pa. Mar. 25, 2013).)

In Geddis, the Third Circuit Court of Appeals held that "the lack of investigation **alone** [did] not establish that the [defendant] fired [the plaintiff] based on discriminatory reasons." Geddis, 40 F. App'x at 653 (emphasis added). Similarly, in Epps, the court held: "[I]t is well-recognized that the fact that a company conducted an inadequate investigation of employee misconduct or failed to interview an employee during an internal investigation, **without more**, is not sufficient to raise an inference of discrimination." Epps, 2013 WL 1216858 (citing Geddis, 40 F. App'x at 653; Glenn v. Raymour and Flanigan, 832 F.Supp.2d 539, 553 (E.D. Pa. 2011) (emphasis added). Here, plaintiff relies upon more than Devine's lack of investigation to prove pretext. As discussed above, a reasonable jury could find that plaintiff's performance evaluation, conducted just over one month prior to her termination, was favorable to plaintiff; indeed, plaintiff's overall rating indicated she consistently met expectations, she was awarded a merit raise, had established goals for the upcoming work year, and Medved noted that that plaintiff "possess[ed] the skill and talents to take the HIM Department to the next level." (ECF No. 111-5 at 127.) It is undisputed that Devine reviewed plaintiff's performance evaluation prior to making the decision with Medved and Roth to terminate plaintiff's employment. Under those circumstances, a reasonable jury could find Devine's lack of investigation into why plaintiff received a favorable performance evaluation yet Roth and Medved wanted to terminate her employment is evidence that Devine knew Roth and Medved were not motivated by a legitimate

nondiscriminatory reason for firing plaintiff. Although defendants are correct that Devine's lack of investigation—without more—is not sufficient to establish pretext, plaintiff points to evidence of record other than the lack of investigation to meet her burden to show pretext in this case.

###### f.  Post-hoc rationale

Plaintiff argues that defendants relying upon the anonymous letter sent to Medved is a post-hoc rationale that is evidence of pretext in this case. Plaintiff cites <u>Lawrence v. Nat'l Westminster Bank N.J.</u>, 98 F.3d 61, 67 (3d Cir. 1996), in support of this argument. In <u>Lawrence</u>, a former employee sued his employer, claiming age and handicap discrimination. During his employment, the employee sustained back injuries in a June 30, 1987, car accident. After the accident, the employee returned to work. <u>Id.</u> at 64. On September 3, 1993, at the age of sixty, the employee was terminated. The employer asserted that he was terminated for substandard performance and "behavior not befitting a manager." <u>Id.</u> at 65. The employee contended that this reason was a pretext for age or disability discrimination. <u>Id.</u> The Court of Appeals for the Third Circuit held that the employee presented sufficient evidence to cast doubt on the employer's stated nondiscriminatory reason for his termination to create a material issue of fact. <u>Id.</u> at 66. The employer argued the employee's final performance evaluation demonstrated his substandard performance. The employee noted, however, that the evaluation was unsigned and undated, and his supervisor admitted the evaluation was never presented to the employee. <u>Id.</u> The employer additionally argued that a March 1993 memorandum detailing several reasons why the employee was not "the right person to lead" the employer in the future supported its nondiscriminatory reason. <u>Id.</u> at 67. The employee contended that the memorandum was prepared as an after-the-fact justification, because it was written at the direction of the employer's human resources office after the termination decision was made. <u>Id.</u> To support his arguments, the employee also

presented depositions of subordinates who portrayed his performance in a positive light. Based upon the evidence of record, the court of appeals held that a reasonable jury could infer that the employer did not act for a nondiscriminatory reason. Id.

Here, defendants in their brief cite to the anonymous letter as evidence corroborating Roth's and Medved's beliefs that plaintiff was responsible and culpable for the DEC medical records. Defendants argue that "Ms. Medved and Dr. Roth investigated and **considered** this letter insofar as it dealt with the exact same issues and problems found by DOH." (ECF No. 102 at 10) (emphasis added.) In defendants' position to the EEOC, they assert the anonymous letter "confirmed for Ms. Medved, Ms. Roth, and Ms. Devine that they were making the right decision in terminating [plaintiff's] employment." (ECF No. 111-11 at 12.) As plaintiff argues, however, Devine testified that defendants do not place any value on anonymous letters. None of the decision makers in this case pointed to the anonymous letter as a reason for terminating plaintiff's employment. Defendants' argument at the summary judgment stage that Roth and Medved considered the letter is not supported by the record and may be considered as a post-hoc reason for firing plaintiff and evidence of pretext.

### g. Defendants' reasoning changed many times

Plaintiff argues defendants' reason for terminating plaintiff has changed many times, which is evidence of pretext. (ECF No. 114 at 19.) In UPMC's position statement to the EEOC dated September 30, 2011, UPMC wrote plaintiff was fired "as a direct result of her failure in the audit process," explaining:

> Complainant's statements to the DOH, coupled with the utter disarray of WPIC's Health Information Management department, subjected WPIC and UPMC Presbyterian-Shadyside to the potential loss of millions of dollars in Medicare and Medicaid reimbursement…. Complainant's dismal performance during the audit warranted her immediate termination of employment.

(ECF No. 111-11 at 8, 13.) In UPMC's response to plaintiff's first set of interrogatories, UPMC wrote plaintiff was fired

> because of poor work performance in responding to a Department of Health Audit ("DOH") survey at WPIC which occurred in February 2010. Specifically, Plaintiff's ill-conceived responses to the DOH surveyors, coupled with the general disarray in the Health Information Management ("HIM") Department at WPIC led to the DOH reporting its survey results to the Center for Medicare and Medicaid Services ("CMS") which, in turn, required UPMC Presbyterian Shadyside (which includes WPIC) to implement a plan of correction and to submit to further surveys and audits.

(ECF No. 111-11 at 16.) Medved, Roth, and Devine testified that plaintiff was fired because she negated responsibility for the DEC medical records during her February 23, 2010 interview with Bachowski. Plaintiff argues that a reasonable jury could find defendants' position statement to the EEOC and their response to plaintiff's first set of interrogatories shows defendants also cited to the "utter disarray" of the HIM department and UPMC Presbyterian Shadyside being subjected to a plan of correction as additional reasons for firing plaintiff. Plaintiff's argument lacks merit.

In defendants' position statement and their response to plaintiff's interrogatories, defendants indicate that plaintiff's performance during the DOH audit is the reason they fired her. Defendants explain that plaintiff's performance <u>and</u> the "general disarray" in the HIM department caused UPMC Presbyterian to implement a plan of correction and to submit to additional surveys and audits. Defendants mention the disarray of the HIM department, but do not cite that as a reason for plaintiff's termination; rather, defendants blame plaintiff's performance and the disarray of the HIM department for the additional surveys and the implementation of the plan of correction.

Plaintiff argues that Medved and Roth gave varying reasons for why plaintiff was fired. In plaintiff's argument, however, she cites testimony of Medved and Roth in which they state, in

various ways, defendants' reason for firing plaintiff, i.e., plaintiff negated responsibility for the DEC medical records during the February 23, 2010 interview with Bachowski. That Medved or Roth used different words in explaining the same concept is not evidence of pretext in this case.

Plaintiff argues paragraphs 55 and 85 of defendants' statement of material facts "represent yet another evolution in Defendants' reason." (ECF No. 114 at 20.) Again, plaintiff's argument lacks merit. Paragraph 55 provides:

> 55. Plaintiff responded as follows:
>
>> "We don″t do any record analysis for ambulatory programs . . . The DEC is an ambulatory program . . . We only do it [record analysis] for inpatient records . . . We just accept what they [DEC staff] send to us . . . The record review of the DEC would be the responsibility of the DEC . . . We are the custodians of the documents, we store everything. We aren″t responsible for the DEC."
>
> Plaintiff's Dep. at 202; Ex. 7 at DeCecco 0292. The gist of what Plaintiff said is that she was not responsible for DEC medical records. Owens Dep. at 157.

(D.J.C.S.F. (ECF No. 125) ¶ 55.)

> Paragraph 85 provides:
>
> 85. Dr. Roth decided to terminate Plaintiff″s [sic] employment because she made egregious errors which led to condition-level violations and placed UPMC Presbyterian Shadyside in danger of losing "deemed" status, thereby losing its ability to participate in the Medicare program. Roth Dep. at 189-90. Loss of Medicare eligibility would threaten the existence of all of UPMC Presbyterian Shadyside, which includes UPMC Presbyterian, Shadyside, Montefiore Hospitals, most of the Hillman Cancer Center and WPIC. Roth Dep. at 231; 254; Medved Dep. at 329.

(Id. ¶ 85.) The reason defendants set forth in each of these paragraphs is consistent with the testimony of Roth, Medved, and Devine. Paragraph 55 provides what defendants argue plaintiff told Bachowski during the February 23, 2010 interview. Paragraph 85 describes what Roth viewed as the result of plaintiff's performance during the February 23, 2010 interview with

Bachowski. These paragraphs do not represent an "evolution" with respect to defendants' reason for firing plaintiff.

Although plaintiff pointed to other evidence of record sufficient to meet her burden and preclude the entry of summary judgment in favor of defendants, the evidence plaintiff points to show defendants' changing reason for firing plaintiff is not sufficient to show pretext or that defendants' reason changed overtime.

### h. Roth's preference for younger workers

Plaintiff, relying upon Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 333 (3d Cir. 1995), argues that Roth describing potential UPMC employees as "young lady" or "young woman" "constitutes relevant circumstantial evidence of discrimination." (ECF No. 114 at 21.) Defendant argues plaintiff's argument is unavailing under the factors set forth in Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997), and "[n]one of the four people [to whom Roth referred] has anything to do with Plaintiff or her case or situation." (ECF No. 121 at 14.) Defendant argues that under those circumstances, Roth's comments are not evidence of pretext.

Stray remarks are generally not sufficient standing alone to warrant a finding of pretext. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir.1997). The Court of Appeals for the Third Circuit established three factors to determine whether a stray remark is probative of discrimination: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement. Keller v. Orix Credit Alliance, Inc., 130 F.3d at 1112; Ryder, 128 F.3d at 133. These factors must be considered in toto in light of the nature and context in which the comment was made. Keller, 130 F.3d at 1112.

The Keller decision, which specifically addressed a comment made by a decisionmaker is illustrative of this premise.[1] In Keller, the plaintiff alleging age discrimination offered evidence that his immediate superior, who ultimately made the decision to terminate Keller, remarked to him: "*If you are getting too old for the job*, maybe you should hire one or two *young* bankers." Id. at 1111 (emphasis in original). The court of appeals began its analysis of the comment by stating the following:

> [The supervisor's] alleged words certainly constitute evidence from which a reasonable factfinder could draw an *inference* of age-based animus, but *we do not think that these words alone could reasonably be viewed as sufficient to prove by a preponderance of the evidence* that age was a determinative cause of Keller's subsequent termination.

Id. at 1112 (emphasis added). The court of appeals determined that the conversation took place four or five months prior to the time the decisionmaker decided to terminate Keller, and the comment did not refer to the specific employment question whether Keller should be terminated. Id. at 1112. Based upon this finding, the court of appeals determined that the comment, standing alone, lacked the probative force to survive summary judgment. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997).

With respect to the first factor in this case, i.e., the relationship of the speaker to the employee, Roth, president of WPIC and a final decision maker in this case, made the comments describing the potential employees, most of whom Roth knew on a personal basis, as "young." Unlike in Keller, the decisionmaker in this case did not make a comment about age directly to plaintiff. With respect to the second factor, i.e., the temporal proximity of the statement to the

---

[1] Keller was an *en banc* decision of the United States Court of Appeals for the Third Circuit, giving the opinion even greater precedential value than a decision handed down by a three-judge panel. See Bolden v. Southeastern Pennsylvania Transp. Authority, 953 F.2d 807, 813 (3d Cir. 1991) (*en banc* panel not bound by prior precedents of three-judge panels, but only by principles of *stare decisis*); Mennen Co. v. Atlantic Mut. Ins. Co., 147 F.3d 287, 294 n.9 (3d Cir. 1998) (only an *en banc* decision can overturn a prior three-judge panel's opinion).

adverse employment decision, plaintiff was informed about her termination on June 1, 2010. Roth wrote the emails describing the potential employees as young on August 11, 2010, February 18, 2011, June 15, 2011, January 11, 2012, and January 14, 2012. The August 11, 2010 email was written a little more than two months after plaintiff was terminated. With respect to the third factor, i.e., the purpose and content of the statement, the purposes of Roth's emails were to recommend recent college graduates or a law student for internships or jobs within UPMC, and similar to the situation in Keller, the comments made by Roth did not refer to the specific employment question whether plaintiff should be terminated. Comparing the comments made by Roth to the comment made in Keller, which the court of appeals determined was not sufficient to prove by a preponderance of the evidence that the employer acted with discriminatory animus, this court cannot conclude that Roth's stray comments about potential employees being young, without considering additional evidence, are evidence of age discrimination.

### ii. Prong two of **Fuentes** test

The second prong of the Fuentes framework permits the plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762. The kinds of evidence relied upon by the court of appeals under this prong of the Fuentes analysis are: 1) whether the employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer has treated more favorably similarly situated persons not within the protected class. Simpson, 142 F.3d at 644-45 (3d Cir. 1998). Plaintiff in this case does not argue pretext under the second prong of Fuentes. The court having found plaintiff met her burden under the first prong need not consider this prong.

### iii. Conclusion

Plaintiff points to evidence of record sufficient to show a genuine dispute of material fact with respect to whether defendants' proffered legitimate nondiscriminatory reason for firing her is the actual reason defendants fired plaintiff or the actual reason is plaintiff's age. Defendants' motion for summary judgment will, therefore, be denied with respect to plaintiff's allegation that she was fired because of her age.

### B. Facial retaliation claim

In plaintiff's facial retaliation claim, she argues the Separation Agreement violates 29 U.S.C. § 623(d) because it expressly conditions a privilege of employment on abstention from activities protected by the ADEA. (ECF No. 96 at 5.) According to plaintiff, covenants against engaging in activities protected under the ADEA are discriminatory per se and, therefore, she is entitled to summary judgment on her facial retaliation claim. (Id. at 7.) Defendants argue § 623(d) does not provide for a facial retaliation claim, and they are entitled to summary judgment on that basis. (ECF No. 103 at 3.)

Section 623(d) provides:

(d) Opposition to unlawful practices; participation in investigations, proceedings, or litigation

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). This provision is known as the retaliation provision of the ADEA. To establish a prima facie case of retaliation under the ADEA, i.e., § 623(d), a plaintiff must show:

"'(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" <u>Fogleman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997)). Defendants argue plaintiff's claim for facial retaliation fails as a matter of law because she did not establish any element of the prima facie case for retaliation. Plaintiff argues that her claim is a *facial* retaliation claim, which does not require proof of the elements of the prima facie case. According to plaintiff, although the language of § 623(d) does not expressly provide for a facial retaliation claim, "courts interpret provisions such as § 623(d) not only to prohibit retaliation, but also to 'prohibit a wide variety of employer conduct that is intended to restrain, or that has the likely effect of restraining, employees in the exercise of protected activities.'" (ECF No. 96 at 1 (quoting <u>Bill Johnson's Restaurants, Inc. v. NLRB</u>, 461 U.S. 731, 740 (1983).) Plaintiff cites two decisions in support of her facial retaliation claim: <u>E.E.O.C. v. Board of Governors of State Colleges and Universities</u>, 957 F.2d 424 (7th Cir. 1992), and <u>E.E.O.C. v. U.S. Steel Corporation</u>, 671 F.Supp. 351 (W.D. Pa. 1987). Plaintiff argues that the courts in each of these decisions recognized a claim for facial retaliation, and this court should follow those decisions in granting plaintiff summary judgment in this case.

In <u>Board of Governors</u>, the court held that a provision of a collective bargaining agreement between the defendant and its employees requiring the employees to choose between their contractual right to an in-house grievance proceeding or filing a complaint in federal court or with the EEOC was a retaliatory policy actionable under § 623(d). <u>Board of Governors</u>, 937 F.2d at 431. The court in <u>Board of Governors</u> based its decision on § 623(d) not requiring a showing of intent in retaliatory policy cases. <u>Id.</u> at 427. The court explained: "To the contrary,

Section 4(d) is concerned with the effect of discrimination against employees who pursue their federal rights, not the motivation of the employer who discriminates. Section 4(d) explicitly prohibits discrimination against employees who engage in protected activity." Id. The court concluded:

> When an employee's participation in statutorily protected activity is the determining factor in an employer's decision to take adverse employment action, that action is invalid regardless of the employer's intent. If the employer's differential treatment of its employees is impermissible, the policy which provides for its differential treatment is invalid regardless of the employer's motivation for adopting or invoking the policy. Hence the Board's asserted good faith in discriminating against employees who file claims in administrative and judicial forums is entirely irrelevant.

Id. at 428. In other words, the court in Board of Governors held that because retaliatory action is actionable under § 623(d), policies providing for impermissible retaliation are invalid under that provision. The court agreed with the EEOC and held that because the provision in issue in the collective bargaining agreement "authorize[d] [the defendant] to take an adverse employment action (termination of the in-house grievance proceeding) for the sole reason that the employee has engaged in protected activity (filing an ADEA claim)," it violated § 623(d) of the ADEA with respect to ADEA claimants because it was discriminatory on its face. Id. at 430-31.

In U.S. Steel, the EEOC sued the defendant-employer for "engaging in employment practices that violate section 4(d) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d), by requiring certain employees to sign a release of rights under the ADEA in order to obtain a pension plan known as a 70/80 retirement under mutually satisfactory conditions." U.S. Steel, 671 F.Supp. at 353. Also in issue in the lawsuit was the defendant-employer's policy requiring all employees requesting the 70/80 retirement plan to release or waive all claims and causes of action under the ADEA. Id. at 354. The release also:

set[] forth a promise by the employee/signatory (1) not to file or permit to be filed on his or her behalf any claim under the ADEA; (2) not to counsel or assist in the prosecution of such claim whether on his behalf or on the behalf of others; and (3) to withdraw any such claim filed by the employee/signatory or by others on his or her behalf and to not participate in such claim. The form also provide[d] for certain penalties against individuals who breach[ed] their obligations under the release, including repayment of any benefits received plus interest and a conversion of the employee's retirement from the 70/80 to the less desirable standard retirement plan.

Id. at 354-55. The EEOC argued the provisions of the release were "impermissible" and "deter[red] individuals from filing charges or otherwise opposing practices made unlawful by the ADEA, as well as hindering the EEOC from performing its Congressionally mandated duty to enforce the provisions of the ADEA." Id. at 356-57.

The court in U.S. Steel agreed with the EEOC and held the "counsel and assist," "charge or claim," and "withdrawal" provisions were invalid and enjoined the defendant-employer from enforcing them. U.S. Steel, 671 F.Supp. at 357-59. The court based its decision on "the express provisions of § [623](d)" and public policy. The court determined that in light of the threat of reclassification of the more favorable 70/80 pension set forth in the agreement, the "counsel and assist" and "charge or claim" provisions, if permitted to stand, would deter signatories from discussing their situations with the EEOC and participating in ADEA claims in fear their 70/80 pensions would be immediately reclassified to less favorable pensions. Id. at 358. On that basis, the court held the provisions were invalid as a matter of law and enjoined their enforcement.

Plaintiff argues that like the defendant-employers in Board of Governors and U.S. Steel, defendants conditioned receipt of a privilege of employment, i.e., severance benefits, on plaintiff's promise not to engage in protected activities under the ADEA. According to plaintiff, defendants "forc[ing] separated employees to choose between a privilege of employment and

exercising rights protected by § 623(d)" constitutes facial discrimination under § 623(d). (ECF No. 96 at 11.)

The weight of the authority and the text of § 623(d), however, support defendants' position with respect to the facial retaliation claim in this case, i.e., § 623(d) does not provide for a claim for facial *retaliation*. In <u>E.E.O.C. v. SunDance Rehabilitation Corp.</u>, 466 F.3d 490, 503 (6th Cir. 2006), the court held the "mere offer" of an unenforceable separation agreement is not a facial violation of the retaliation provision of the ADEA. The separation agreement in <u>SunDance</u> offered terminated employees "severance pay in exchange for, among other things, promises not to sue or file an administrative charge and not to make any statement or take any action that would reflect negatively on [the defendant-employer]." <u>Id.</u> at 492. The separation agreement also provided the defendant-employer the right to return of the severance payment if the terminated employee violated the conditions of the separation agreement. <u>Id.</u> The district court granted summary judgment in favor of the EEOC holding "that the separation agreement constitutes facial retaliation under the antiretaliation statutory provisions to the extent that it conditions severance pay on a promise not to file a charge with the EEOC." <u>Id.</u> The defendant-employer appealed the district court's decision.

On appeal to the Court of Appeals for the Sixth Circuit, the EEOC argued the separation agreement was a per se violation of, among other statutes, § 623(d) of the ADEA. <u>SunDance</u>, 466 F.3d at 497. The EEOC relied upon <u>Board of Governors</u> in support of its position. The court in <u>SunDance</u> rejected the EEOC's argument and distinguished <u>Board of Governors</u> from the case before it, explaining:

> We do not find the Seventh Circuit's <u>Board of Governors</u> opinion to be compelling precedent with respect to this case. In <u>Board of Governors</u>, the employer actually took an adverse action against the employee because the employee had pursued the statutorily protected activity of filing a charge with the

> EEOC. That action clearly constituted retaliation in violation of 29 U.S.C. §
> 623(d). While the Seventh Circuit addressed what it determined to be the facially
> retaliatory CBA provision that purported to authorize that action, that policy was
> before the Seventh Circuit because the employer had implemented it and had
> engaged in a retaliatory act. Here, SunDance has offered a contract, and, on the
> record before us, has engaged in no further action.

Id. at 498. The court did not address the enforceability of the separation agreement in issue, but

noted that to the extent it prevented "mere participation in EEOC proceedings," it was

unenforceable. Id. at 501. The court explained that a provision of the separation agreement being

unenforceable did not make the offering of that agreement *retaliatory*, and the employees were

not without recourse as they were free to "accept the agreement and argue later that parts of it

may be unenforceable under existing or expanded precedent." Id.

Other courts considering the validity of a facial retaliation claim have followed SunDance

and declined to recognize a claim for facial retaliation under § 623(d). See e.g. E.E.O.C. v.

Nucletron Corp., 563 F.Supp.2d 592 (D.Md. 2008); Quattrone v. Erie 2 Chautauqua-Cattaraugus

Bd. of Cooperative Education Services, Civ. Action No. 08-367, 2011 WL 4899991 (W.D.N.Y.

Oct. 13, 2011); Perez v. Faurecia Interior Sys., Inc., Civ. Action No. 08-4046, 2009 WL 2227510

(D.S.C. July 22, 2009); E.E.O.C. v. Sears, Roebuck & Co., 857 F.Supp. 1233 (N.D. Ill. 1994).

In Nucletron, the EEOC sued the defendant-employer, Nucletron, for retaliation under

two theories:

> (i)    Nucletron's policy of conditioning the award of severance benefits upon
>        the terminated employee's agreement not to file a discrimination charge or
>        to participate in proceedings before the EEOC constitutes "facial
>        retaliation," and
>
> (ii)   Nucletron retaliated against Dove for engaging in a protected activity by
>        denying him severance benefits.

Nucletron, 563 F.Supp.2d at 594. The court held that the EEOC could succeed under the second

theory, but not the first. Id. at 595. The court noted that the first theory was rejected by the court

in SunDance, which held "the mere offer of an unenforceable severance agreement is not 'discrimination' as defined by the anti-retaliation provisions of the employment statutes." Id.

Similar to the facts of this case, the defendant-employer in Nucletron "set[] out its official policy regarding the provision of severance benefits in its employee handbook." Id. As part of that policy, the defendant-employer required its employees to sign a severance agreement upon their termination in order to receive severance benefits. Id. The court described the severance agreement as follows:

> The agreement demands that the employee waive his rights under several employment statutes, including the Age Discrimination in Employment Act (the "ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Equal Pay Act of 1963 (the "EPA"). The agreement also requires the employee to promise neither to file a charge relating to his employment with any federal agency nor to participate in any such action. If an employee files or participates in such a charge, the agreement gives Nucletron the right to recover: (i) the severance payment, (ii) liquidated damages, and (iii) attorney's fees. In exchange for the release, Nucletron provided the employee a severance payment and a period of continued employment at a reduced work schedule.

Id. at 595-96. The defendant-employer in Nucletron offered twelve employees the severance agreement. Id. at 596. Unlike plaintiff in this case who signed the separation agreement and received severance benefits, one of the twelve employees in Nucletron did not sign the severance agreement or receive severance benefits. Id. at 596. The other eleven employees, like plaintiff in this case, signed the agreement and received the severance benefits. Id.

The parties in Nucletron, i.e., the EEOC and the defendant-employer, both agreed "that the portion of the severance agreement that require[d] an employee to waive his right to file or to participate in an EEOC discrimination charge [was] unenforceable." Nucletron, 563 F.Supp.2d at 597. The parties disagreed, however, with respect "to whether the mere offer of an unenforceable severance agreement constitute[d] retaliation under…the ADEA." Id. According to the EEOC, even if the defendant-employer did not enforce the waiver and the employee did not file a charge

with the EEOC, the defendant-employer's "policy of conditioning the receipt of severance benefits on a waiver of the right to file a charge with the EEOC constitute[d] 'facial retaliation.'"

Id. The court disagreed with the EEOC, and distinguished Board of Governors from the case before it. The court explained:

> As the Sixth Circuit explained in SunDance, however, Board of Governors is distinguishable. The legality of the policy in Board of Governors was before the Seventh Circuit because the employer had enforced it against employees who had filed charges with the EEOC. SunDance, 466 F.3d at 498. The Board of Governors Court did not state that the existence of the policy alone constituted retaliation. The Court merely held that when the employer enforced its policy against employees who had filed EEOC charges, the affected employees could prove their retaliation claims without producing evidence that the employer had acted with retaliatory animus. Board of Governors, 957 F.2d at 427–428. The Seventh Circuit did not create a cause of action for employees who had not yet been denied a grievance proceeding.

Nucletron, 563 F.2d at 598. The court noted that the defendant-employer in Nucletron, unlike the defendant-employer in Board of Governors, did not attempt to enforce the severance agreement, and, therefore, did not take any action in retaliation to an employee's protected activity. The court recognized that "[t]he term 'discrimination' in the anti-retaliation provision of Title VII includes any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination,'" but "[t]he mere offer of a severance agreement does not fit this definition." Id. (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Accordingly, the court held: "the employer's action only reaches the level of retaliation if it denies severance benefits that are otherwise promised or owed or if the employer sues to enforce the agreement. The mere offer of the agreement, without more, is not adverse and therefore not 'discrimination' under the statute." Nucletron, 563 F.Supp.2d at 599.

The EEOC in Nucletron, argued that policy reasons supported its facial retaliation claim. Similar to plaintiff in this case, the EEOC in Nucletron argued "the offer of the severance

agreement may chill employees who sign the agreement from filing an informational charge with the EEOC or participating in an EEOC proceeding." Id. The court recognized the EEOC's policy argument, but was ultimately unpersuaded. The court reiterated that the mere offer of the severance agreement did not constitute sufficiently adverse employment action under the pertinent statues, and the employee was not without recourse. Id. The court explained:

> First, the employee or the EEOC can bring an action under the OWBPA seeking a declaration that the unenforceable provisions of Nucletron's severance agreement are void. Other courts in the Fourth Circuit have recognized such claims. See, e.g., Krane v. Capital One Services Inc., 314 F.Supp.2d 589, 609 (E.D.Va.2004) ("[A]n employee can seek declaratory and injunctive relief for a violation of the OWBPA."). Second, as stated below, the Court will issue an injunction prohibiting Nucletron from enforcing the invalid provisions of the severance agreement against any of the eleven employees who signed it. Finally, the OWBPA is clear and easy to understand. An employee who consults a lawyer will immediately learn that the invalid portions of the agreement are unenforceable.

Nucletron, 563 F.Supp.2d at 599.

With respect to EEOC's second theory of recovery, i.e., the defendant-employer retaliated against the employee who did not sign the severance agreement by withholding severance benefits otherwise owed to him, the court held that theory of recovery was "viable" under the McDonnell Douglas burden shifting framework and permitted the EEOC to develop it throughout discovery. Id. The court explained the elements of the prima facie case of retaliation and noted:

> Whether the EEOC can prove its claim will turn on the factual issue of whether the severance payment that Nucletron denied Dove was an additional payment or an amount already promised or owed to terminated employees. As stated above, an employer may offer an additional severance payment in exchange for a release of any claims under the retaliation statutes and a promise not file suit against the employer. See SunDance, 466 F.3d at 502. An employer may not, however, withhold standard employee benefits because an employee has refused to waive his rights under the anti-discrimination statutes. See Bernstein v. The St. Paul Cos., Inc., 134 F.Supp.2d 730, (D.Md.2001).

If the EEOC can prove that Nucletron provided the payment offered in the severance agreement as a matter of course to all terminated employees, then it can establish the second element of its claim. If, however, the severance payment is a benefit over and above what is promised employees generally, then the EEOC's retaliation claim will fail.

Under this analysis, it is irrelevant whether the severance agreement included a waiver of the right to file a charge with the EEOC or to participate in an EEOC proceeding. If the severance benefit offered was not otherwise promised or owed, then Nucletron took no retaliatory adverse action by refusing to provide it to Dove.

Nucletron, 563 F.Supp.2d at 600.

Based upon review of the authority cited by the parties, which weighs in favor of defendants' position, and the text of § 623(d), there is insufficient support for the court to recognize a facial retaliation claim under § 623(d). That section provides:

(d) Opposition to unlawful practices; participation in investigations, proceedings, or litigation

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, ***because* such individual, member or applicant for membership has opposed any practice made unlawful by this section, or *because* such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.**

29 U.S.C. § 623(d) (emphasis added). The Supreme Court and the Third Circuit Court of Appeals have never recognized a facial retaliation claim stemming from this provision of the ADEA.[5] The Supreme Court and the Third Circuit Court of Appeals have, however, recognized McDonnell Douglas retaliation claims under this provision, which require the plaintiff to set

---

[5] When faced with a "retaliation per se" claim under New Jersey discrimination law, the Third Circuit Court of Appeals held: "[The plaintiff's] contention that the offering of the Release was retaliation per se is unsupported and unpersuasive. Further, [the plaintiff] has not demonstrated the requisite elements for a prima facie case of retaliation." Moran v. DaVita Inc., 441 F. App'x 942, 947 (3d Cir. 2011).

forth the prima facie case discussed above.[6] Under § 623(d), it is unlawful for an employer to take an adverse employment against its employee because the employee engage in activity protected under the ADEA. In this case and unlike <u>Board of Governors</u> in which the employer *actually enforced* the collective bargaining agreement against an employee that filed a charge with the EEOC, plaintiff did not identify protected activity she engaged in or that defendants took a sufficiently adverse employment action against her. As the court noted in <u>Nucletron</u>, offering a severance agreement with unenforceable terms is not sufficient to constitute adverse employment action under the ADEA. To the extent the provisions of the Separation Agreement are unenforceable because they run afoul of § 623(d), i.e., they permit defendants to retaliate against plaintiff for engaging in protected activity, the provisions are unenforceable as a matter of law. Unlike one of the twelve employees in <u>Nucletron</u>, plaintiff in this case signed the Separation Agreement and defendant provided her a severance benefit; defendants did not withhold a term or privilege of plaintiff's employment because she refused to waive her rights to file a claim with the EEOC or participate in an EEOC proceeding. Under those circumstances, the court is not persuaded by plaintiff's citations to <u>Board of Governors</u> and <u>U.S. Steel</u>. This court, like the court in <u>SunDance</u> and its progeny, declines to recognize a claim of facial retaliation under § 623(d) of the ADEA.

Plaintiff argues, however, that <u>SunDance</u> and <u>Nucletron</u> are distinguishable from this case and should not be followed. Plaintiff argues <u>SunDance</u> is inapplicable to this case because

---

[6] Analyzing the antiretaliation provisions of Title VII, which contain language similar to § 623(d) of the ADEA, the Supreme Court recently held "that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." <u>Univ. of Tx. Southwestern Med. v. Nassar</u>, 133 S.Ct. 2517, 2528 (2013). The language used by the Court implies that under that provision of Title VII, which contains similar language to § 623(d), an employer must take an adverse employment action against an employee because the employee engaged in protected activity.

in that case and unlike this case, the severance payment was not an employee benefit "woven into the terms, conditions and privileges of an employment relationship pursuant to a contract (as in *Board of Governors*) or an employee benefits plan (as in this case and *U.S. Steel*)." (ECF No. 96 at 14.) Plaintiff argues this distinction is relevant in light of the Supreme Court's pronouncement that "[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all." Hishon v. King & Spalding, 467 U.S. 69, 75 (1984). The error in plaintiff's argument, however, is that plaintiff signed the Separation Agreement and received the severance benefit. She was not denied anything that she was owed pursuant to the employee benefits plan by defendants. This case would be different if plaintiff, like the plaintiff in Nucletron, refused to sign the Separation Agreement and defendants refused to pay her the severance benefit. Under those circumstances, plaintiff may be able to establish a prima facie case of retaliation, i.e., defendants failed to pay plaintiff a benefit she was owed in retaliation to her refusing to waive her rights to file a claim with the ADEA or EEOC. Those are not the facts of this case because plaintiff received the severance benefit. Distinguishing SunDance on that basis will not preclude the entry of summary judgment as a matter of law in favor of defendants; indeed, the severance payments in Nucletron "were part of the standard severance package promised or owed all terminated employees," but the court still found the "mere offer" of the severance agreement was insufficient to constitute retaliation under § 623(d). Nucletron, 563 F.Supp.2d at 599.

Plaintiff also distinguishes SunDance on the basis that the severance offer in that case "was made *ad hoc*; it occurred once, following a one-time [reduction in force] and was not repeated." (ECF No. 96 at 14.) Plaintiff argues that in this case, like in Board of Governors and

U.S. Steel, the employer, i.e., defendants, had "an explicit employment *policy* that establishes discriminatory conditions to accessing an 'employee benefit' provided as part of the terms, conditions and privileges of employment." (Id.) The UPMC Welfare Benefits Plan in this case provided that to be eligible for severance benefits under the Severance Policy, employees must "sign and return a UPMC approved Separation Agreement and General Release," and employees who "refuse to or fail to sign and return a UPMC-approved Separation Agreement and General Release" are ineligible for severance benefits. (Summary Plan Description (ECF No. 95-1) at 21-23.) Under the heading "Release Requirement," the Severance Policy provides:

> You will become eligible for severance payments only after you sign and deliver to your Human Resources Consultant, or his or her designee, a UPMC-approved (provided by and acceptable to UPMC) Separation Agreement and General Release to UPMC. You also must return the signed Separation Agreement and General Release within the time frame specified by UPMC. The Separation Agreement and General Release will include, among other items, a release of all employment-related and other claims that may, by law, be released.

(P.J.C.S.F. (ECF No. 116) ¶ 12; Summary Plan Description (ECF No. 95-1) at 23.) This policy as set forth in the UPMC Welfare Benefits Plan is not unenforceable on its face; it does not contain the provisions in the Separation Agreement that plaintiff argues are unenforceable, and the evidence of record does not show that the Separation Agreement given to plaintiff was given to all UPMC employees.[7] Even if plaintiff produced evidence showing that defendants used

---

[7] In the parties' joint combined statement of material facts submitted with respect to plaintiff's facial retaliation claim, plaintiff asserts that "[t]he Separation Agreement that UPMC presented to Ms. DeCecco **is** the 'Separation Agreement and General Release' that UPMC references in the Severance Policy set forth in Plan No. 501." (P.J.C.S.F. (ECF No. 116) ¶ 16.) Plaintiff cites paragraph eighty-one of her complaint and paragraph four defendants' answer, which admits paragraph eighty-one of her complaint, in support of this alleged fact. In paragraph eighty-one of the complaint, plaintiff alleges: "Upon information and belief, the "Confidential Separation Agreement and General Release" UPMC presented to Ms. DeCecco is the 'Separation Agreement and General Release' described in Plan No. 501, or is substantially identical thereto." (ECF No. 1 ¶ 81.) Defendants' admission of this fact, however, does not mean that a reasonable jury could find it was defendants' policy to give terminated employees the identical separation

similar separation agreements containing unenforceable provisions with other terminated employees, however, there would be no claim for relief under § 623(d) without evidence that defendants took an adverse employment action against an employee for engaging in protected activity.

Plaintiff also argues this court should not follow <u>SunDance</u> because the court in that decision failed to conduct a "deterrence analysis." In support of this argument, plaintiff cites to the quotation from <u>Bill Johnson's</u> that "[t]he [Supreme] Court has liberally construed *these* laws as prohibiting a wide variety of employer conduct that is intended to restrain, or that has the likely effect of restraining, employees in the exercise of protected activities." <u>Bill Johnson's</u>, 461 U.S. at 740 (emphasis added). In this quotation, the Supreme Court was referring to the antiretaliation provisions of the National Labor Relations Act and not the ADEA; indeed, the five decisions cited by the Supreme Court in support of the sentence quoted by plaintiff concern the antiretaliation provision of the National Labor Relations Act.[8]

To the extent the Supreme Court's analysis of the antiretaliation provision of the National Labor Relations Act has any relevance to this court's analysis of the ADEA, the Supreme Court in <u>Bill Johnson's</u> was analyzing "whether the [National Labor Relations Board] may issue a cease-and-desist order to halt the prosecution of a state court civil suit brought by an employer to retaliate against employees for exercising federally-protected labor rights, without also finding

---

agreement given to plaintiff in this case. Based upon defendants' admission of paragraph eighty-one of the complaint, a reasonable jury could find the Separation Agreement given to plaintiff is the "Separation Agreement and General Release" described in UPMC's Welfare Benefits Plan, but the admission does not support a reasonable jury finding that defendants gave the exact separation agreement given to plaintiff to all terminated employees, pursuant to company policy.

[8] <u>NLRB v. Scrivener</u>, 405 U.S. 117, 121-25 (1972); <u>NLRB v. Gissel Packing Co.</u>, 395 U.S. 575, 617-19 (1969); <u>NLRB v. Exchange Parts Co.</u>, 375 U.S. 405, 408-10 (1964); <u>Republic Aviation Corp. v. NLRB</u>, 324 U.S. 793, 797-79 (1945); <u>Phelps Dodge Corp. v. NLRB</u>, 313 U.S. 177, 182-87 (1941).

that the suit lacks a reasonable basis in fact or law." <u>Bill Johnson's</u>, 461 U.S. at 733. Whether a facial retaliation claim exists—even under the National Labor Relations Act—was not before the court. Plaintiff does not cite to any decisions in which a court conducted a "deterrence analysis" under the ADEA as plaintiff argues is set forth in <u>Bill Johnson's</u>. The courts in <u>Board of Governors</u> and <u>U.S. Steel</u> did not cite to <u>Bill Johnson's</u> in support of any such analysis. The courts in <u>Board of Governors</u> and <u>U.S. Steel</u> relied upon the deterrent effect of the defendant-employers actions, i.e., offering terminated employees severance agreements with unenforceable provisions, in holding the severance agreements were retaliatory on their face. The courts in <u>SunDance</u> and <u>Nucletron</u> also considered the "chilling" or deterrent effect separation agreements containing unenforceable provisions may have on the exercise of an employee's rights to file a charge with or participate in EEOC proceedings. Those courts, however, recognized that the mere offer of a severance agreement is not sufficient to constitute a "sufficiently adverse employment action" under the ADEA. <u>Nuceltron</u>, 563 F.Supp.2d at 599; <u>see</u> <u>SunDance</u>, 466 F.3d at 501.

In further support of a "deterrence analysis" and her facial retaliation claim, plaintiff cites to the Supreme Court's pronouncement in <u>Burlington Northern</u> that an adverse employment action for the purposes of Title VII, includes "those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." <u>Burlington Northern</u>, 548 U.S. at 70. The Supreme Court's pronouncement in <u>Burlington Northern</u>, however, was made in the context of a <u>McDonnell Douglas</u> retaliation claim, which requires a plaintiff to prove the elements of the prima facie case discussed above. In any event, it is unclear what plaintiff means by a "deterrence analysis." Neither <u>Bill Johnson's</u> nor <u>Burlington Northern</u> address whether a facial retaliation claim exists under the ADEA based upon a defendant-employer's offering of a

severance agreement containing unenforceable provisions to a terminated employee. Based upon the foregoing, the court's failure in <u>SunDance</u> to conduct a "deterrence analysis" is not a ground upon which this court will grant plaintiff summary judgment with respect to her facial retaliation claim.

Plaintiff next argues that "[t]he panel majority in *SunDance* misconstrued *Board of Governors* and created incentives for employers to discriminate." (ECF No. 96 at 15.) Plaintiff argues the court's attempt to distinguish <u>Board of Governors</u> from the case before it based upon the defendant-employer in <u>Board of Governors</u> enforcing the provisions of the severance agreement lacks merit. According to plaintiff, "[l]iability in a discriminatory policy case does not turn on whether the employer has taken an adverse action against a particular employee. The issue is whether the employer's policy discriminates because of a protected factor." (ECF No. 96 at 15 (citing <u>E.E.O.C. v. Johnson & Higgins, Inc.</u>, 91 F.3d 1529, 1542 (2d Cir. 1996).) Plaintiff's argument in this respect is not persuasive because although provisions of the Separation Agreement may be unenforceable, their existence in a separation agreement given to and signed by plaintiff does not support a claim of retaliation under § 623(d). Plaintiffs failed to set forth evidence to support a reasonable jury finding of a prima facie case of retaliation, which is required under § 623(d).

Plaintiff argues the court's decision in <u>SunDance</u> "perversely encourages employers to threaten retaliation with the *goal* of eliminating statutorily protected activities from the workplace." (ECF No. 96 at 16.) According to plaintiff, under <u>SunDance</u>, "*a discriminatory employment policy so threatening as to be 100% successful in deterring protected activities could never be challenged.*" (<u>Id.</u>) As the court explained in <u>SunDance</u>, however, employees are not without recourse because they are free to "accept [unenforceable] agreement[s] and argue

later that parts of [the agreement] may be unenforceable under existing or expanded precedent." SunDance, 466 F.3d at 501. In Nucletron, the court noted the ability of a plaintiff to seek declaratory or injunctive relief under the OWBPA. Nucletron, 563 F.Supp.2d at 599. Furthermore, to the extent an employee refuses to sign an agreement similar to plaintiff's Separation Agreement, and defendants withhold a privilege or condition of the employee's performance, e.g., the severance benefit, the defendants' conduct may be actionable under ADEA as set forth in Nucletron. Similar to the policy arguments made in Nucletron by the EEOC, plaintiff's policy arguments are insufficient for the court to read into § 623(d) a claim that is not supported by the text of the statute and has not been recognized by the Supreme Court or the Third Circuit Court of Appeals.

Plaintiff argues her facial retaliation claim is supported by the EEOC's Enforcement Guidance on Non-Waivable Employee Rights under Equal Employment Opportunity Commission Enforced Statutes, No. 915.002 (Apr. 10, 1997) ("EEOC's Guidance"), available at http://www.eeoc.gov/policy/docs/waiver.html (last visited February 27, 2014). In the EEOC's Guidance, it provides:

> Notwithstanding the format or context of the agreement in which such language might appear, promises not to file a charge or participate in an EEOC proceeding are null and void as a matter of public policy. *Agreements extracting such promises from employees may also amount to separate and discrete violations of the anti-retaliation provisions of the civil rights statutes.*

Id. (emphasis added.) Plaintiff argues the EEOC's Guidance "is entitled to considerable deference" under Skidmore v. Swift & Co., 323 U.S. 134 (1944). (ECF No. 96 at 10.) As the Supreme Court recently noted: "The weight of deference afforded to agency interpretations under Skidmore depends upon 'the thoroughness evident in its consideration, the validity of its

reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" Nassar, 133 S.Ct. at 2533 (quoting Skidmore, 323 U.S. at 140).

The main contention in the EEOC's Guidance is that agreements between employers and employees pursuant to which employees waive their rights to file a charge with the EEOC or participate in EEOC proceedings are null and void. Defendants in this case do not contest the validity of this statement. The EEOC's Guidance, however, also provides that "[a]greements extracting such promises from employees may also amount to separate and discrete violations of the anti-retaliation provisions of the civil rights statutes." Enforcement Guidance on Non-Waivable Employee Rights under Equal Employment Opportunity Commission Enforced Statutes, No. 915.002 (Apr. 10, 1997) ("EEOC's Guidance"), available at http://www.eeoc.gov/policy/docs/waiver.html (last visited February 27, 2014). This pronouncement is in issue in this case. To support this statement, the EEOC sets forth the following two public policy considerations:

> Agreements that prevent employees from cooperating with EEOC during enforcement proceedings interfere with enforcement activities because they deprive the Commission of important testimony and evidence needed to determine whether a violation has occurred. Furthermore, insofar as such agreements make it more difficult for the Commission to prosecute past violations, an atmosphere is created that tends to foster future violations of the law.
> …
> A strong public policy interest also prohibits interference with the right to file a charge with EEOC.

Id. Section B of the EEOC's Guidance, entitled "Prohibitions Against Retaliation," provides:

> Congress enacted provisions barring retaliation in each of the statutes enforced by the Commission in large part to ensure that employees remain free to report suspected violations to the government.
> …
> Agreements that attempt to bar individuals from filing a charge or assisting in a Commission investigation run afoul of the anti-retaliation provisions because they impose a penalty upon those who are entitled to engage in protected activity under

one or more of the statutes enforced by the Commission. By their very existence, such agreements have a chilling effect on the willingness and ability of individuals to come forward with information that may be of critical import to the Commission as it seeks to advance the public interest in the elimination of unlawful employment discrimination. See, e.g., EEOC v. Board of Governors, 957 F.2d 424 (7th Cir.), cert. denied, 506 U.S. 906 (1992) (unlawful retaliation for a collective bargaining agreement to allow the termination of an administrative grievance proceeding upon the filing of a charge with EEOC); EEOC v. Cosmair, Inc., 821 F.2d at 1089 (impermissible retaliation arises when payments to which one is otherwise entitled are stopped merely because a charge is filed with EEOC); EEOC v. U.S. Steel Corp., 671 F.Supp. at 358 (retaliation under §4 (d) of the ADEA results when an employer revokes enhanced pension benefits for persons who file charges or otherwise participate in EEOC proceedings)5. Cf. Connecticut Light & Power v. Secretary of Labor, 85 F.3d 89 (2d Cir. 1996) (construing the anti-retaliation provisions of the Energy Reorganization Act of 1974 and finding a violation where an agreement sought to prevent an individual from reporting unlawful conduct to the government).

Id. Section C of the EEOC's Guidance provides that the policy set forth in the Guidance is "Consistent with the Public Interest in the Voluntary Settlement of Employment Discrimination Disputes." Id. The EEOC's Guidance concludes with the following:

> For the reasons set forth and discussed above, an employer may not interfere with an individual's protected right under Title VII, the EPA, the ADA, or the ADEA to file a charge, testify, assist, or participate in any manner in an EEOC investigation, hearing, or proceeding.

Id.

In issue in this case with respect to the EEOC's Guidance is the weight the court should give the EEOC's pronouncement that "[a]greements extracting [promises not to file a charge or participate in an EEOC proceeding] from employees may also amount to separate and discrete violations of the anti-retaliation provisions of the civil rights statutes." Id. Considering the factors relevant to the inquiry in this case, i.e., "'the thoroughness evident in its consideration, [and] the validity of its reasoning,'" the court is unable to afford the EEOC's Guidance any weight with respect to whether the existence of a separation agreement with unenforceable provisions may constitute actionable retaliation under § 623(d). Nassar, 133 S.Ct. at 2533

(quoting Skidmore, 323 U.S. at 140). The policy rationale set forth by the EEOC in the EEOC Guidance supports the statement that an employee's promise not to file an EEOC charge or participate in an EEOC proceeding are unenforceable as a matter of law. The policy reasons, however, do not support that there can be a claim of facial retaliation under § 623(d). The EEOC does not analyze the text of § 623(d), which requires a plaintiff to prove a protected activity and an adverse employment action, or provide any other basis for a claim for facial retaliation. The EEOC cites four decisions in support of its position, but does not consider other decisions that stand in opposition to the decisions it cites in support of the Guidance. The EEOC's Guidance does not provide the circumstances under which such a claim "may" arise or any other guidance in that respect. Under those circumstances, the EEOC's Guidance "lack[s] the persuasive force that is a necessary precondition to deference under Skidmore." Nassar, 133 S.Ct. at 2532. The court is unable, therefore, to accord any weight to the EEOC's Guidance in this case. Nassar, 133 S.Ct. at 2532 ("The manual's failure to address the specific provisions of this statutory scheme, coupled with the generic nature of its discussion of the causation standards for status-based discrimination and retaliation claims, call the manual's conclusions into serious question.").

Based upon the foregoing, the court finds there is insufficient authority to support plaintiff's facial retaliation claim under § 623(d). Defendants' motion for summary judgment with respect to the facial retaliation claim will be granted; plaintiff's partial motion for summary judgment with respect to the facial retaliation claim will be denied and her claim for facial retaliation will be dismissed. To the extent the provisions in issue in the Separation Agreement are unenforceable, however, plaintiff "can bring an action under the OWBPA seeking a declaration that the unenforceable provisions of [UPMC's] severance agreement are void."

Nucletron, 563 F.Supp.2d at 599 (citing <u>Krane v. Capital One Servs. Inc.</u>, 314 F.Supp.2d 589, 609 (E.D. Va. 2004)).

### C. Older Workers' Benefit Protection Act

Plaintiff argues paragraph 10(c) of the Separation Agreement "facially violates § 1625.23(a)" of the regulations to the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) ("OWBPA"). Section 1625.23(a) provides:

> (a) An individual alleging that a waiver agreement, covenant not to sue, or other equivalent arrangement was not knowing and voluntary under the ADEA is not required to tender back the consideration given for that agreement before filing either a lawsuit or a charge of discrimination with EEOC or any state or local fair employment practices agency acting as an EEOC referral agency for purposes of filing the charge with EEOC. Retention of consideration does not foreclose a challenge to any waiver agreement, covenant not to sue, or other equivalent arrangement; nor does the retention constitute the ratification of any waiver agreement, covenant not to sue, or other equivalent arrangement.

29 C.F.R. § 1625.23(a).

Section 10(c) of the Separation Agreement provides:

> [Plainitff] [a]grees that this Release will survive the termination of this Agreement and, further, that her acceptance of any and all payments under the terms of this Agreement, will constitute a continuing ratification and reaffirmation of the terms of the foregoing release as applied to any and all possible claims based upon acts, events or failure to act before the acceptance of each such payment.

(Separation Agreement (ECF No. 95-3) at 5.)

Section 1625.23(a) of the regulations provides that contract principles of tender back and ratification do not apply to ADEA waivers. Under this section, an employee challenging an ADEA waiver, like plaintiff, is not required to tender back any consideration in exchange for his or her agreement to waive his or her ADEA claims. Here, plaintiff filed a charge with the EEOC and a lawsuit in this court against defendants under the ADEA. Plaintiff has not tendered back the severance benefits paid to her by defendants. With respect to paragraph 10(c), this court has

already held that the ADEA claims waiver in the Separation Agreement is invalid because it violates the OWBPA. Because there cannot be "continuing ratification" of an invalid release, paragraph 10(c) is no longer applicable to plaintiff. Plaintiff already challenged the validity of the ADEA claims release and won that challenge. Section 1625.23 of the regulations is, therefore, inapplicable to this case, and the court does not need to address whether paragraph 10(c) of the Separation is a facial violation of the OWBPA.

## V. Conclusion

There are genuine issues of material fact with respect to whether the *actual* reason defendants fired plaintiff was her performance during the February 23, 2010 interview with Bachowski or the *actual* reason was her age. Defendants' motion for summary judgment with respect to plaintiff's first claim of McDonnell Douglas age discrimination will be denied.

The text of § 623(d) and the weight of authority does not support the existence of a facial retaliation claim under § 623(d). Defendants' motion for summary judgment with respect to the facial discrimination claim will be granted; plaintiff's motion for partial summary judgment will be denied, and the claim for facial retaliation will be dismissed.

An appropriate order will be entered.


Dated: March 7, 2014                                    BY THE COURT:

                                                        /s/ JOY FLOWERS CONTI
                                                        Joy Flowers Conti
                                                        Chief United States District Judge